STATE v. LYLE

(118 S. E., 803)

1. CRIMINAL LAW—PROOF OF UTTERANCE OF OTHER FORGED CHECKS BY ACCUSED AT APPROXIMATELY SAME TIME AND PLACE HELD ADMISSIBLE ON QUESTION OF IDENTITY.—In a prosecution for uttering a forged check at a bank, testimony by other bankers in the same town that defendant on the morning of the alleged offense had passed forged checks at their banks at approximately the same time *held* practically a part of the *res gestae,* each a part of the general scheme, and admissible for the purpose of establishing the identity of accused under an issue raised as to an alibi, notwithstanding the general rule that evidence of other and distinct offenses is inadmissible.

2. CRIMINAL LAW—WHERE EVIDENCE ADMISSIBLE TO PROVE IDENTITY, STATE ENTITLED TO BENEFIT AS RELATES TO ISSUE OF CRIMINAL INTENT.—Where evidence of other offenses than that charged is admis-

sible to prove identity, in exception to the general rule, the State is entitled to the benefit of this evidence in so far as it also subserves the purpose of establishing the element of a scienter or criminal intent, notwithstanding guilty knowledge or criminal intent was not a disputed or issuable fact in the case.

3. CRIMINAL LAW—SIMILARITY BETWEEN CRIME CHARGED AND ANOTHER TO WARRANT INFERENCE OF GUILT MUST BE SUCH AS TO EXCLUDE POSSIBILITY THAT OTHER CRIME WAS COMMITTED BY ANOTHER.—In order that guilt of a particular offense may be inferred from its similarity to other offenses the similarity must establish such a connection between the crimes as would logically exclude or tend to exclude the possibility that the present crime could have been committed by any other person than accused.

4. CRIMINAL LAW—EVIDENCE OF EXTRANEOUS CRIME TO PROVE IDENTITY ADMISSIBLE ONLY WHEN NECESSARY.—To justify the admission of evidence of an extraneous crime in exception of the general rule for the purpose of proving identity, such evidence must be necessary.

5. CRIMINAL LAW—EVIDENCE OF EXTRANEOUS OFFENSES HELD INADMISSIBLE ON QUESTION OF ACCUSED'S IDENTITY.—In a prosecution for uttering a forged check, evidence of extraneous offenses committed in another State *held* inadmissible on the question of accused's identity.

6. CRIMINAL LAW—FORGERY—INTENT TO DEFRAUD ESSENCE OF CRIME OF UTTERING FORGED CHECK; EVIDENCE OF PREVIOUS OFFENSES ADMISSIBLE TO ESTABLISH.—Intent to defraud is the essence of the crime of uttering a forged check, and previous offenses of a similar character by the same person may be proved to show such intent.

7. CRIMINAL LAW—EVIDENCE OF EXTRANEOUS CRIMES NOT RENDERED INADMISSIBLE ON QUESTION OF INTENT BY ADMISSION BY DEFENDANT OF CRIMINAL INTENT IF HIS CONNECTION WITH CRIME IS ESTABLISHED.—The admission by defendant of criminal intent, if his connection with the crime charged is proven, will not always render inadmissible proof of other similar crimes to establish such intent.

8. FORGERY—FELONIOUS INTENT NOT INFERABLE FROM ACT ITSELF, BUT FROM MANNER OF ITS COMMISSION AND RES GESTAE.—Though felonious intent in prosecution for uttering forged instrument cannot be inferred from the nature of the instrument itself, it may be inferred from the manner of its commission and the *res gestae.*

9. CRIMINAL LAW—PROOF OF EXTRANEOUS OFFENSES HELD IMPROPERLY ADMITTED ON ISSUE OF CRIMINAL INTENT, IN VIEW OF DEFENDANT'S ADMISSION OF SUCH INTENT UPON PROOF OF HIS PARTICIPATION.—In a prosecution for uttering a forged instrument, where defendant has admitted criminal intent subject to proof of his participation

in the act charged, *held*, that there was no reasonable necessity remaining for the introduction of evidence of similar offenses for the purpose of showing criminal intent or guilty knowledge, and that the admission of such evidence was erroneous as imposing additional burden of meeting it on accused.

10. CRIMINAL LAW—EXTRANEOUS CRIMES MUST BE ESTABLISHED BY LEGAL AND COMPETENT EVIDENCE BEFORE GUILTY INTENT MAY BE INFERRED THEREFROM.—Before guilty intent may be inferred from other similar crimes, they must be established by legal and competent evidence.

11. CRIMINAL LAW—EVIDENCE OF EXTRANEOUS OFFENSES HELD INADMISSIBLE TO ESTABLISH PLAN OR SYSTEM CONSTITUTING A CONTINUOUS TRANSACTION.—In a prosecution for uttering a forged check, evidence of extraneous similar offenses which was inadmissible as bearing on the identity of the accused or for the purpose of showing a criminal intent *held* inadmissible for the purpose of showing a plan or system pursuant to which the offense charged had been committed as a part of a continuous transaction.

12. CRIMINAL LAW—HANDWRITING SPECIMENS CONSTITUTING· PART OF EXTRANEOUS OFFENSES HELD INADMISSIBLE.—In a prosecution for uttering a forged check, where the question whether the signature on the check in defendant's handwriting was in issue, specimens of handwriting alleged to be defendant's which constituted part of similar extraneous offenses *held* inadmissible, and not such as would afford a legitimate basis for identification by comparison.

13. CRIMINAL LAW—GENUINE HANDWRITING SHOULD NOT BE RECEIVED FOR PURPOSES OF COMPARISON IF IT TENDS TO ESTABLISH OTHER IRRELEVANT OR PREJUDICIAL MATTER.—If genuine handwriting sought to be used as a standard for comparison is otherwise incompetent because of its tendency to prove other irrelevant or prejudicial matter, it should not be received for the purpose of comparison.

14. CRIMINAL LAW—SPECIMENS OF DEFENDANT'S HANDWRITING INTRODUCED HELD PROPERLY ADMISSIBLE FOR PURPOSES OF COMPARISON.— In a prosecution for uttering a forged check, where the question whether the signature on the check was in defendant's handwriting was in issue, specimens of handwriting from a hotel register, from the property book of the police department, and on a card written by him at the instance of police officers after his arrest, identified by witnesses who testified that they saw defendant make the writings, *held* properly admitted as a basis of comparison.

15. CRIMINAL LAW—WHETHER HANDWRITING SPECIMENS WERE PROCURED AFTER ARREST BY DURESS HELD FOR COURT IN FIRST INSTANCE, AND ULTIMATELY FOR JURY.—In a prosecution for uttering a forged check, the question as to whether specimens of defendant's handwriting made by him at the instance of a detective after arrest had

been procured by duress *held* for the determination of the trial Court in the first instance, and ultimately for the jury.

16. CRIMINAL LAW—MERE FACT THAT WRITING USED AS BASIS FOR COMPARISON WAS EXECUTED BY DEFENDANT AFTER ARREST DOES NOT ESTABLISH ITS INVOLUNTARY CHARACTER.—In a prosecution for uttering a forged check alleged to have been signed by defendant, the mere fact that writing used as a basis of comparison was executed by defendant after his arrest at the request of an officer does not conclusively establish its involuntary character, so as to render it inadmissible, and *held,* that the Court, by admitting such writing, with the explanation that it would be left to the jury whether it was procured by duress, had not thereby deprived defendant of any substantial right.

17. CRIMINAL LAW—INSTRUCTION AS TO WEIGHT OF EVIDENCE AS TO GENUINENESS OF HANDWRITING HELD PROPERLY DENIED.—In a prosecution for uttering a forged check, where the question whether the signature on the check was in defendant's handwriting was in issue, an instruction, "evidence as to the genuiness of handwriting is generally regarded as of a weak and unsatisfactory character," *held,* properly denied as a charge on the facts.

18. CRIMINAL LAW—COURT HAS NO DISCRETIONARY POWER TO EXCLUDE COMPETENT EVIDENCE TENDING TO ESTABLISH MATERIAL FACT.—Though the Court may exclude cumulative evidence in reply, it has no discretionary power to exclude competent evidence that is not merely cumulative offered as to a material point of fact, proof of which is essential to the establishment of a party's defense; the test being whether accused has been "fully heard in his defense," as he is entitled to be under Const. 1895, Art. 1, § 18 (Code Cr. Proc. 1922, § 82).

19. CRIMINAL LAW—SERIOUS DOUBT AS TO ADMISSIBILITY OF EVIDENCE ALWAYS RESOLVED IN DEFENDANT'S FAVOR.—Where there is a serious doubt as to the admissibility of evidence, that doubt should always be resolved in defendant's favor.

20. CRIMINAL LAW—COURT'S LIMITING NUMBER OF WITNESSES WHICH DEFENDANT MIGHT PRODUCE IN ESTABLISHING AN ALIBI HELD PREJUDICAL ERROR.—In a prosecution for uttering a forged check, where the alleged offense occurred between 9:30 and 12 on a particular day, where the defense was an alibi, *held,* that the Court, by dividing the period between 9:30 a. m. and 12 into half-hour periods, and permitting defendant to introduce only three witnesses who testified as to his presence during each period, committed prejudicial error.

21. CRIMINAL LAW—NUMERICAL STRENGTH OF WITNESSES WHOSE TESTIMONY TENDS TO CORROBORATE ONE ANOTHER AS TO A MATERIAL POINT IS NOT MERELY CUMULATIVE.—Where testimony adduced by defend-

ant for the sake of establishing the alibi is susceptible of an infer-
ence that it is honest, but involves an error of a half hour or more
in the witnesses' recollection of the time or period of time as to
which they testified, the numerical strength of witnesses tends to
corroborate the testimony of one another as to vitally material
points of such defense, is not merely cumulative, and the exclusion
of a part thereof on that ground is erroneous.

22. CRIMINAL LAW—EVIDENCE LOCATING ACCUSED'S COMPANION AT
OTHER THAN PLACE OF OFFENSE IN CONTRADICTION OF STATE'S
THEORY HELD ADMISSIBLE.—In a prosecution for uttering a forged
check, where it was the State's theory that defendant at the time
of the offense had been accompanied by another with whom he was
arrested, evidence tending to discredit State's case as to the presence
of such a person on the scene *held* relevant and admissible.

23. WITNESSES—EVIDENCE TO ESTABLISH GOOD REPUTATION OF WITNESS
APPEARING FOR DEFENDANT HELD ADMISSIBLE.—In a prosecution for
uttering a forged check, where it was the State's theory that de-
fendant had been accompanied by another at the time of the offense,
and where such other appeared as a witness for defendant, evidence
to prove the good reputation of such witness, who was unknown in
the community, *held* admissible.

Before RICE, J.Aiken, May 1922.   Reversed and reman-
ded.

Milton A. Lyle convicted of uttering a forged check and
appeals.

*Messrs. W. M. Smoak* and *Sawyer & Gyles,* for appellant,
cite: *As to admission of testimony of other crimes:* 40
S. C., 481; 1 Bish. New Crime. Proc., 1120; 120 S. C., 218;
77 S. C., 242; 56 S. C., 500. *Evidence of other forgeries
inadmissible:* 35 N. E., 145; 42 N. E., 180; 27 N. W.,
455; 24 S. E., 561; 84 N. W. 980. *Rule as to comparison
of handwriting:* 32 S. C., 115; 5 S. C., 482; 15 A. & E.
Enc. L. (2nd. Ed), 272, 273; Lawson Expert Evid., 408;
Rogers Expert Test'y 318; 62 L. R. A., 826; 2 McC.
L., 518; 3 Rich. L., 382; 18 S. C., 506; 24 S. C., 285;
41 S. C., 193; 17 Cyc., 181, 182; 82 N. Y., 41; 63 N. Y.
Supp., 592; 10 Cush., 453; 62 Vt., 1; 151 U. S., 303; 119
Mass., 155; 5 Ad. & Ell., 730; 1 McM., 125; 35 Am. Rep.,
356; 1 A. L. R., 1306. *Writing of defendant at request of*

*police not part of oral confession:* 3 N. W., 41; 32 Fed., 370; 1 A. L. R., 1302; 81 Va., 374; 62 L. R. A., 193; 128 Pac., 441. *Handwriting expert:* 36 Fed. Rep., 893. *Proof of reputation of witness, a stranger:* 116 S. C., 165; 30 S. C., 131; 52 Am. Dec., 344.

*Messrs. R. L. Gunter, Solicitor, D. W. Gaston, Jr.* and *Hendersons,* for the State, cite: *Proof of other crimes proper to show guilty knowledge:* 56 S. C., 495; 30 S. C., 131; 80 S. C., 390; 77 S. C., 100; 83 S. C., 256; 91 S. C., 551; 11 N. E., 64; 66 A. L. R., 808; 3 Cush., 243; 101 Ky., 556. *Proof of a collateral offense relevant to prove identity:* 34 L. R. A. (N. S.), 644; 43 L. R. A. (N. S.), 1206; 3 A. L. R., 1537; 22 A. L. R., 1006; 135 N. E., 657; 167 Ky., 544. *And to show a system of crime:* 39 S. C., 321; 66 A. S. R., 844; 129 A. S. R., 675; 57 Md., 108. *Comparison of handwriting:* 33 S. C., 116; 100 S. E., 489; 17 Cyc., 164; 13 S. C. L., 518.

August 23, 1923.

The opinion of the Court was delivered by MR. JUSTICE MARION.

The defendant was convicted May, 1922, of uttering, January 12, 1922, a forged check upon the Farmers' & Merchants' Bank of Aiken, S. C. From the sentence imposed he has appealed upon 79 exceptions.

The defense was an alibi, and, broadly stated, the sole issue of fact in the Court below was whether the defendant was the identical person who uttered the forged check. Since the exceptions are almost wholly directed to assignment of error in the admission and exclusion of evidence, a somewhat extended review of the evidentiary facts is essential to a proper understanding of the legal questions sought to be raised and to a fair appraisal of appellant's contentions as to the commission of prejudicial error. The exceptions thus lend themselves to the division of the case into its two main branches as chronologically developed

in the evidence.    The State's case will therefore be first
outlined, and the assignments of error in the admission of
evidence disposed of, following which the defendant's case
will be outlined, and the exceptions relating to exclusion
of evidence considered.

On January 12, 1922, between the hours of 9:30 a. m.,
and 12 o clock m., a young white man walked into the
Farmers' & Merchants' Bank, in the City of Aiken.    He
introduced himself to Mr. J. C. Thomas, a receiving and
paying teller, to whom he was a total stranger, as "E. P.
Gaines," and stated that he desired to open an account.    In
response to questions, he stated that he lived about 8 miles
from Aiken, on the Columbia road, near Mr. Piper and
Mr. Courtney; that he got his mail at Box 49, Route No. 2;
that he had formerly lived out from Columbia; that he was
married, and had one child; and that he had been recom-
mended to that bank by Mr. Piper.    He presented a check
for $790.32, purporting to have been signed by "G. E.
Owens, per L. C. Eubanks," a well-known and reputable
local cotton dealer, payable to "E. P. Gaines," and drawn
on the Bank of Western Carolina, another Aiken bank.
Mr. Thomas opened his window, and the stranger wrote
the indorsement "E. P. Gaines" on the back of the check.
The check was deposited and an account opened in the name
of "E. P. Gaines."    The pseudo-customer then indicated
that he wished to get a part of the money and checked on
his new account for $292.30, which amount was paid him
in cash.    He also signed an address and signature card.
Mr. Thomas saw him write the name "E. P. Gaines" three
times—on the Owens check, on his check for $292.30, and
on the signature card.    The transaction occupied from
five to ten minutes.    In the course of the interview "Gaines"
discussed with Mr. Thomas the price of cotton; said that
it was hard to sell cotton for 17 cents when it had cost 30
cents, that he was going to make it cheaper "this year,"
and "scratched his head a little."    He was dressed in

ordinary working clothes; looked the part of a good country farmer. In the bank at the same time Gaines was there was another stranger, apparently unconnected in any way with Gaines. Thomas suspected nothing wrong. The "Owens" check went to the Bank of Western Carolina for clearing not later than 1:30 p. m. It was returned within a few minutes of 2 p. m. marked "Forgery." Thereupon Mr. Thomas looked for "Gaines" in Aiken, but Gaines had disappeared. The interview with Gaines was on Thursday. Mr. Thomas saw the defendant, Lyle, at the Terminal Hotel, Augusta, Ga., about 6:30 o'clock the following Sunday morning in a room occupied by Lyle and J. C. Westberry. Thomas says he recognized Lyle before he got out of his bed. He then and thereafter positively identified the defendant, Lyle, as the E. P. Gaines who had uttered the forged check, and identified his roommate, J. C. Westberry, as the other stranger who had been in the bank when Lyle, as Gaines, was passing the forged check.

Upon the foundation thus laid it is the State's theory that the burden of proving the defendant's guilt beyond a reasonable doubt required the erection of an evidential structure that would completely encompass two points: (1) That the defendant, Lyle, was the identical person who, as E. P. Gaines, passed the forged check as charged; and (2) that it was uttered with guilty knowledge or criminal intent. To that end the State offered and introduced, over defendant's objection, the following testimony: (1) That of Pardue, teller of the Bank of Western Carolina, to the effect that between 10 and 12 on this same morning of January 12, 1922, in Aiken, S. C., the defendant, Lyle, then a total stranger, under the name of Art Wilson, had presented to him and cashed another forged G. E. Owens check for $182.70, drawn on his bank; (2) that of Schroeder, assistant cashier of the First National Bank, to the effect that, between 10:30 and 12 o'clock on the same morning, in Aiken, S. C., the defendant, Lyle, then a total stranger, had pre-

sented to him another forged G. E. Owens check for $794.60 upon which he had opened an account for $500 and had received in cash $294.60 under the name of "E. J. Willis," which name was indorsed on the check when presented and which name the witness saw Lyle sign on the signature card, giving his address as "R. 2, Box 49, Aiken," and that J. C. Westberry was also in his bank at the time of the transaction with Lyle; (3) that of Bell, assistant cashier of a Griffin, Ga., bank, to the effect that on the morning of January 3, 1922, between 9 and 10 o'clock, in Griffin, Ga., the defendant, Lyle, then unknown to him, had presented a check payable to R. T. Edwards, and so indorsed, and under that name had opened an account for $500, and received in cash $350, after returning, with the name "R. T. Edwards" written thereon, a blank signature card, which had been handed him by the cashier; (4) that of Mrs. Bray, assistant cashier of a bank in Athens, Ga., to the effect that on December 30, 1921, in Athens, the defendant Lyle, then a stranger, presented a check signed by a local cotton factor, payable to "A. S. Harper," in the sum of $878.60, indorsed the check, and signed a signature card in her presence in the name of A. S. Harper, opened an account in that name for $500, and received in cash $278.60; (5) that of Hammett, an assistant cashier of a bank in La Grange, Ga., to the effect that on November 23, 1921, between 9 and 10 o'clock a. m., the defendant, Lyle, then a stranger, presented a forged check for $987.40, opened an account for $500, and received in cash $487.40, under the name of "A. J. Martin." All of said witnesses positively identified the defendant, Lyle, after his arrest in Augusta and imprisonment in Aiken, as the person, who, under another name, at the times and places indicated, had passed fraudulent checks, and had left in their possession certain specimens of handwriting, all of which were produced on the trial, except the writing on the check passed to Hammett, which check had been lost.

The foregoing testimony was followed by evidence directed to establishing by a comparison of handwriting that the signature "E. P. Gaines" on the forged check, for the utterance of which the defendant, Lyle, was on trial, was the handwriting of Lyle. To that end the State introduced, over objection, the register of the Terminal Hotel, of Augusta, Ga., January 14, 1922, in which the defendant had written "J. C. Westberry, Chattanooga," and "M. A. Lyle, Chattanooga;" the signature of the defendant, "M. A. Lyle," written in the property book of the police department of Augusta, after his arrest, and a card upon which the defendant, after his arrest, in the presence of Whitehead, a detective, and Goodson, a policeman, at Whitehead's instance, had written the names "M. A. Lyle," "J. C. Westberry," "E. P. Gaines," "E. J. Willis," and "Art Wilson." The State then introduced, over objection, the testimony of three experts, all bankers of Aiken, S. C., to the effect that the handwriting on the hotel register, on the property book of the police department, and on the card written by Lyle at the instance of the police officers after his arrest, and the handwriting on the E. P. Gaines check and signature card and on the various other checks and signature cards introduced, were the same handwriting; that is, the handwriting of the same person.

Such, in outline, was the State's case in chief. The numerous exceptions based upon objections to the evidence introduced by the State along the lines indicated advance two general propositions.

First. It is contended that the admisssion in evidence of the testimony of Pardue and Schroeder, the other Aiken bankers, and of Bell, Hammett, and Mrs. Bray, the Georgia bankers, and of the writings identified by them, tending to prove the commission by the defendant of other distinct crimes similar to the crime laid in the indictment, was prejudicially erroneous. That contenton is grounded upon the familiar and salutary general rule, uni-

versally recognized and firmly established in all English-speaking countries, that evidence of other distinct crimes committed by the accused may not be adduced merely to raise an inference or to corroborate the prosecution's theory of the defendant's guilt of the particular crime charged. Bishop, New Crim. Proc., 1120. *State v. Owens* (S. C.) 117 S. E., 537. *People v. Molineux,* 168 N. Y., 264; 61 N. E., 286; 62 L. R. A., 193. The objections, from the viewpoint of English jurisprudence, to the admission of this class of evidence are patent. Proof that a defendant has been guilty of another crime equally heinous prompts to a ready acceptance of and belief in the prosecution's theory that he is guilty of the crime charged. Its effect is to predispose the mind of the juror to believe the prisoner guilty, and thus effectually to strip him of the presumption of innocence. It "compels the defendant to meet charges of which the indictment gives him no information, confuses him in his defense, raises a variety of issues, and thus diverts the attention of the jury from the one immediately before it." *Com. v. Jackson,* 132 Mass., 16; 44 Am. Rep., 299 note; 8 R. C. L., 198, § 194. To this general rule, however, there are certain well-established exceptions which are thus tersely stated by Justice Werner in *People v. Molineux, supra:*

"Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish, (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; (5) the identity of the person charged with the commission of the crime on trial. Wharton on Crim. Ev. (9th Ed.), 48; Underhill on Ev. § 58; Abbott's Trial Brief, Crim. Trials, Sec. 598."

Whether evidence of other distinct crimes properly falls within any of the recognized exceptions noted is often a

difficult matter to determine. The acid test is its logical relevancy to the particular excepted purpose. or purposes for which it is sought to be. introduced. If it is logically pertinent in that it reasonably tends to prove a material fact in issue, it is not to be rejected merely because it incidentally proves the defendant guilty of another crime. But the dangerous tendency and misleading probative force of this class of evidence require that its admission should be subjected by the Courts to rigid scrutiny. Whether the requisite degree of relevancy exists is a judicial question to be resolved in the light of the consideration that the inevitable tendency of such evidence is to raise a legally spurious presumption of guilt in the minds of the jurors. Hence, if the Court does not clearly perceive the connection between the extraneous criminal transaction and the crime charged, that· is, its logical relevancy, the accused should be given the benefit of the doubt, and the evidence should be rejected. Underhill, Criminal Evidence, § 88; *People v. Molineux, supra.*

It is the State's contention in the case at bar that the evidence objected to was admissible upon either or all of three separate grounds: (1) "To prove identity of the accused;" (2 )"to prove guilty knowledge or criminal intent;" (3) and "to show system of crime." The testimony of Pardue and Schroeder, the two Aiken bankers, to the effect that during the hours of the same morning the defendant is alleged to have uttered the forged check as charged in one Aiken bank he was present in their banks in the same town, and passed other forged checks, differs from the testimony of the three Georgia bankers in the essential particular that it tends to locate the accused in the immediate vicinity of the crime at the time of its commission, to refute the defense of an alibi, and thus to identify defendant as the perpetrator of the crime. If Pardue and Schroeder had been in the Farmers' & Merchants' Bank, and had seen the person who there uttered the forged check as he engaged in that

transaction, their testimony for the purpose of identifying the defendant as that person would obviously have been as directly relevant as the testimony of Thompson, the prosecuting witness, himself.   When they say in substance that they saw this same person in Aiken in the immediate vicinity of the crime within a few minutes of the time it was committed, and that this person was the defendant, Lyle, the relevancy of the testimony to the vital issue made is almost equally obvious.   But, since they did not actually see this person in the act of passing the check in the Farmers' & Merchants' Bank, it was essential that their testimony raise the additional inference that it was that identical person they actually saw in their respective banks.   The circumstances that the person seen by them was engaged in a similar transaction, the uttering of a forged check, that these checks purported to have been issued by the same person, that the same R. F. D. address was used in one instance, the marked similarity in technique of operation, etc., all logically tended to establish that the man seen by Pardue and Schroeder was the same person who passed the forged check to Thompson.   If so, their identification of this person as the defendant, Lyle, corroborates Thompson's identification in the essential particulars made vital by the defense of an alibi, that the defendant was personally present at the scene of the crime near the time of its commission.

That evidence is clearly susceptible of the inference that the two extraneous crimes were committed within a few town blocks as to distance, and within a few minutes as to time, of the crime  charged, and that they were practically a part of the *res gestae,* each a part of one general scheme of a single expedition.   See *State v. Weldon,* 39 S. C., 321; 17 S. E., 688; 24 L. R. A., 126.   The connection for the purpose of establishing the identity of the accused under the issue raised as to the alibi we think is clear. The testimony of Pardue and Schroeder was therefore properly admitted upon that ground.   *People v. Jennings,*

252 Ill., 534; 96 N. E., 1077; 43 L. R. A. (N. S.), 1206.
*State v. Fitzsimon,* 18 R. I., 236; 27 Atl., 446; 49 Am. St.
Rep., 766.   *State v. Leroy,* 61 Wash., 405; 112 Pac., 635.
*Leeper v. State,* 29 Tex., App., 63; 14 S. W., 398, affirmed
in 139 U. S., 462; 11 Sup. Ct., 577; 35 L. Ed., 225.   *McCue
v. State,* 75 Tex. Cr. R., 137; 170 S. W. 280, Ann. Cas.
1918C, 674.   *Nash v. State,* 120 Ark., 157; 179 S. W., 159.
*State v. Hetrick,* 84 Kan., 157; 113 Pac., 383; 34 L. R. A.
(N. S.), 642.   *Barnett v. State,* 104 Ohio St., 298; 135
N. E., 647.   See notes, 3 A. L. R. 1540, and 22 A. L. R.,
1016. If admissible to prove identity, the State was entitled
to the benefit of this evidence in so far as it also subserved
the purpose of establishing the element of *scienter* or crimi-
nal intent.   *State v. Rountree,* 80 S. C., 391; 61 S. E., 1072;
22 L. R. A. (N. S.), 833.   *State v. Allen,* 56 S. C., 495;
35 S. E., 204.   *State v. Williams,* 2 Rich., 418; 45 Am.
Dec., 741.   It is unnecessary, therefore, to consider in this
connection the appellant's contention that the evidence was
inadmissible for the latter purpose, in that guilty knowledge
or criminal intent was not a disputed or issuable fact in the
case.

We come now to the more difficult question of whether
the evidence of Bell, Bray, and Hammett to the effect that
the defendant committed similar crimes in Griffin, Ga., on
January 3, 1922, 10 days before the date of the crime charged
in Athens, Ga., on December 30, 1921, 13 days before
the crime, and in La Grange, Ga., on November 23 1921,
about 7 weeks before the crime, was admissible for any pur-
pose within the recognized exceptions to the general rule.
Let us endeavor now to apply to this case each of the ex-
ceptions which the State contends is applicable.

First. As to identity. What is there in the alleged pas-
sing of forged checks at widely separated points in
Georgia from 10 days to 7 weeks prior to the commis-
sion of the crime charged that tends, in a legal sense, to iden-
tify the defendant as the man who uttered the forged paper in

Aiken on January 12?/True, such evidence strongly tends to induce the jury to believe that, merely because the defendant was guilty of the former crimes, he was also guilty of the latter; but that is the precise inference the general rule was wisely designed to exclude. Assuming that the evidence conclusively proved what the State was undertaking to establish—that on these prior dates this identical defendant under substantially similar circumstances had uttered other forged checks—what connection, other than the similarity in character of crime and method of execution, is there between the Georgia crimes and the crime charged in the indictment? There is no connection of time and place, as appears in the Aiken transactions covered by Pardue and Schroeder, which would support a legitimate inference that, because the defendant was at the places at the times designated, he was in Aiken and committed this crime on January 12. If the crimes allocated to Athens, Griffin, and LaGrange, Ga., had been committed in New York, Chicago, or San Francisco, the defendant could just as well have been in Aiken on January 12, and it can hardly be said that the probability of his presence in Aiken on that date would have been greater in one case than the other. The mere fact that the Georgia crimes were similar in nature and parallel as to methods and technique employed in their execution does not serve to identify the defendant as the person who uttered the forged check in Aiken as charged, unless his guilt of the latter crime may be inferred from its similarity to the former. *People v. Molineux, supra.* To warrant such inference the similarity must have established such a connection between the crimes as would logically exclude or tend to exclude the possibility that the Aiken crime could have been committed by another person. *People v. Molineux, supra.* There is nothing to indicate that the defendant held any monopoly of the methods and means used in passing the forged checks in Georgia, or that they were unique in the

annals of crime. That the Aiken crime could have been committed by one of innumerable other persons using like means and methods is obvious. If the inference of identity of persons is to be drawn from mere naked similarity of the crime, then the defense would have been entitled to meet that inference by showing, as doubtless could have been shown, that many similar crimes had been committed by others in practically the same manner and by the same methods. To attempt to cover issues so clearly collateral would involve interminable extension of such inquiries. The commission by defendant of the alleged similar crimes in Georgia was a circumstance entirely consistent with the legal presumption of his innocence of the particular crime charged and with the alibi theory of his defense.

The point is aptly illustrated by the case of *People v. Romano,* 84 App. Div., 318; 82 N. Y. Supp., 749. In that case, wherein it appeared that the robbery for which the defendant was indicted was committed by throwing snuff in the eyes of the victim, the prosecution, for the purpose of establishing the identity of the accused offered proof to show that three weeks prior to the commission of the crime charged he had committed another robbery at the same place on another person by use of the same means. Holding the admission of the evidence to be erroneous, the Court said:

"If the first crime be satisfactorily established, the mind is easily convinced of the guilt of the defendant as to the second, and yet it is common knowledge that numerous crimes of the same character have been committed by other individuals and by the use of the same means. There is always more or less of similarity between the commission of independent crimes of this class, and in many instances features that are common to one are found in the other, and yet it has never been supposed that, where there was separation as to time and no connection established, beyond that of place and similarity, the first crime was ad-

missible to establish any of the elements which constituted the other."

In that case, it will be observed there was a similarity of place not present in the case at bar. In *State v. Kenny*, 77 S. C., 242; 57 S. E., 861, this Court adopted the following statement of the law, quoted from *Shaffner v. Com.*, 72 Pa., 65; 13 Am. Rep., 649:

"To make one criminal act evidence of another, *  *  *  it must be necessary to identify the person of the actor, by a connection which shows that he who committed the one must have committed the other. . Without this obvious connection, it is not only unjust to the prisoner to compel him to acquit himself of two offenses instead of one, but it is detrimental to justice to burden a trial with multiplied issues that tend to confuse and mislead the jury."

That there was no such obvious connection between the Georgia crimes and the offense charged in this case we think is clear. See *Thomas v. Com.*, 194 Ky., 491; 239 S. W., 776 (forgery case). *Rogers v. State*, 17 Ala. App., 175; 83 South. 359 (receiving stolen goods). *Quen Guey v. State*, 20 Ariz., 363; 181 Pac., 175 (assault on female). *State v. Greco*, 7 Boyce (Del.), 140; 104 Atl. 637, (Id.). *Effler v. State*, 4 Boyce (Del.), 62; 85 Atl., 731. *People v. Molineux, supra* (murder). *Boyd v. United States*, 142 U. S., 450; 12 Sup. Ct., 292; 35 L. Ed., 1077; notes, 3 A. L. R., 1540, and 22 A. L. R., 1016.

4, 5    That conclusion is re-enforced by an additional consideration which we deem decisive. We have in the foregoing discussion treated the question as if it were conclusively proved that the defendant committed the similar Georgia crimes. But the evidence tending to identify him as the perpetrator of those crimes, considered apart from the Aiken crime, is even more inconclusive than that which tends directly to identify him as the actor in the Aiken crime./ To justify evidence of an extraneous crime to prove identity such evidence must be "necessary." *State v. Kenny, supra;*

*Gibson v. State,* 14 Ala. App., 111; 72 South., 210. *Billings v. United States,* 42 App. D. C., 413. *State v. Spray,* 174 Mo., 569; 74 S. W., 846. *Kelly v. State,* 79 Tex. Cr. R., 362; 185 S. W. 570. Conceding that the identification of the defendant as the perpetrator of the Aiken crime by the three Aiken bankers and by the comparison of handwriting is rendered sufficiently doubtful by the alibi defense to warrant resort to proof of another similar crime committed by defendant as tending to strengthen the probative force of the evidence as to identity offered by the State, how can it be said that such evidence is strengthened by even more doubtful evidence tending to identify the defendant as the actor in another distinct crime? If the identification of the defendant as the perpetrator of the Aiken crime is doubtful, it would seem clear that it could not be made certain or more certain by an equally or more doubtful identification of the defendant as the perpetrator of a similar extraneous crime, the commission of which is denied and vigorously disputed by the defendant. It might be argued, the testimony of the Georgia bankers tends legitimately to corroborate the identification made by the Aiken bankers in that, upon substantially the same basis of opportunity and experience, they reached the same conclusion as to identity. But, even if the somewhat tenuous corroborative import of the evidence in those circumstances might be considered sufficient to warrant its admission, it is to be observed that the premise that these Georgia bankers identified the defendant upon substantially the same basis of opportunity and experience is open to serious question. They appear to have identified the defendant some time after his arrest and incarceration upon the Aiken charge, and the extent to which their identification was a mere inference from such arrest, from the defendant's identification by the Aiken bankers, and from the similarity of the crimes, and not an identification by recollection or from memory after seeing the defendant once under substantially the same circumstances, is entirely conjectural.

28—S. C., 125

Since, therefore, the probative value of one crime to prove identity in another rests upon the validity of an inference that, because the defendant committed one, he must have committed the other, when the fact of the commission of the extraneous crime is itself predicated upon an identification even less conclusive than the identification the extraneous crime is intended to corroborate, it would seem clear that to admit proof of the extraneous crime for that purpose would be equivalent to reversing the ordinary process of logic by authorizing one doubtful fact to be deduced from an even more doubtful fact. In any view, therefore, we think the evidence under consideration was improperly admitted to prove identity.

Second. As to intent or guilty knowledge. Since a forged check may be uttered innocently, willful intent to defraud or guilty knowledge must be proved before a conviction can be had. Intent to defraud is of the essence of the crime, and previous offenses of a similar character by the same person may be proved to show such intent. *State v. Rountree,* 80 S. C., 391; 61 S. E., 1072; 22 L. R. A. (N. S.), 833. *State v. Allen,* 56 S. C., 495; 35 S. E., 204. *State .v Williams,* 2 Rich., 418; 45 Am. Dec., 741. See *State v. Jacob,* 30 S. C., 131; 8 S. E., 698; 14 Am. St. Rep., 897. *State v. Talley,* 77 .S C., 100; 57 S. E., 618; 11 L. R. A. (N. S.), 938; 122 Am. St. Rep., 559. *State v. Winter,* 83 S. C., 156; 65 S. E., 209. *State v. Ray,* 91 S. C., 551; 75 S. E., 174. *State v. Owens* (S. C.), 117 S. E., 537. Appellant does not contend to the contrary, but does contend that criminal intent or guilty knowledge was not such a disputed and issuable fact in the case at bar as would authorize the admission of this evidence merely to establish such fact. When this class of evidence was offered by the State the defendant through his counsel caused to be spread upon the record an admission to the effect that his defense was an alibi, and that for the purposes of the trial the criminal intent or guilty knowledge of the person who

uttered the forged check, as charged, would be freely and fully conceded. As pointed out by Judge Freeman in his elaborate note on this subject (105 Am. St. Rep., 998) :

"Several Courts have substantially held that where the defendant admits in open Court that the intent of the act charged against him is criminal, although denying participation in the act, that evidence of other crimes for the purpose of proving intent is thereby rendered inadmissible, but the rule thus laid has also been denied."

Against the admissibility of such evidence are cited 8–10 *State v. Vance,* 119 Iowa, 685; 94 N. W., 204, and *State v. Boykien,* 14 Wash., 403; 44 Pac., 889, in favor of admissibility, *Higgins v. State,* 157 Ind., 57; 60 N. E., 685, and *Com. v. Miller,* 3 Cush. (Mass.), 243, to which may be added *State v. Murphy,* 17 N. D., 48; 115 N. W., 84; 17 L. R. A. (N. S.), 609; 16 Ann. Cas., 1133, and *State v. Hyde,* 234 Mo., 200; 136 S. W. 316, Ann. Cas. 1912D, 191. See 8 R. C. L. 206 § 201. We think it may not properly be laid down as a hard and fast rule that, where a defendant admits criminal intent if his connection with the crime is proved, such admission will render inadmissible proof of other similar crimes to establish such intent. The admissibility of evidence for that purpose depends upon its essential relevancy; that is, whether such evidence may be considered reasonably necessary in the light of all the facts of the particular case to accomplish the purpose for which it is offered. Thus it has been held that, where the purpose for which it is sought to introduce evidence showing the commission of other crimes can be accomplished by other evidence, such evidence will not be allowed under that pretense. Note, 105 Am. St. Rep., 999. *People v. Schweitzer,* 23 Mich., 301. It is to be borne in mind that the practice of receiving evidence of other offenses to prove intent in cases of uttering forged paper, passing counterfeit money, etc., is a departure from the general rule of criminal evidence, justified and necessitated by the

peculiar nature of these crimes. *People v. Molineux, supra.*
While felonious intent in such cases may not be inferred from
the nature of the act itself, it may be inferred from the
manner of its commission and the *res gestae.* In the case
at bar the manner and method of passing the forged paper
and all the surrounding circumstances would seem to have
impressed the act with irrefragable indicia of criminal in-
tent. When to these indicia are added the competent evi-
dence as to the commission of the two similar Aiken crimes,
there would seem to be little room for doubt that the State's
obligation to prove criminal intent had been fully met. But
when to such evidence is added the defendant's clear-cut
admission of criminal intent in open Court, subject to proof
of his participation in the act on trial, we think it is clear that
no reasonable necessity remains for the introduction of the
evidence as to the Georgia crimes merely for the purpose of
showing such criminal intent or guilty knowledge. Defend-
ant's admission directed the Court's attention to the only real
issue in the case—whether defendant was the person who
uttered the forged check. Admission of the evidence as to
the alleged Georgia offenses forced him to undertake in
this case the trial of three other cases, not for the purpose
of disproving the admitted criminal intent of the act charged,
but to rebut the illegitimate inference of his guilt that would
be raised by evidence that he had committed or was ac-
cused of having committed other similar crimes. Hence
to permit the injection of this evidence into the case for the
ostensible purpose of proving a fact which was sufficiently
established by other evidence, which was expressly admitted
by defendant, and which had no legitimate bearing upon
the real issue, would be manifestly unjust to the defendant
and clearly repugnant to the rationale of the salutary gen-
eral rule. It is also to be remembered in this connection
that before guilty intent may be inferred from other similar
crimes the extraneous crimes must be established by legal
and competent evidence (*People v. Molineux, supra*), and

that in the case at bar the participation of the defendant in the alleged extraneous crimes was not as conclusively established as his participation in the act charged. Hence the same objection to the probative value of the evidence suggested in discussing its admissibility to prove identity, viz., that it authorizes the drawing of one doubtful inference from another more doubtful inference, is likewise applicable here. We are therefore clearly of the opinion that evidence as to the separate Georgia crimes was inadmissible to prove intent or scienter.

Third. As to plan or system. A plan or system common to other crimes was not an essential ingredient of the crime charged. Whether such crime was committed as part of a common plan or system was wholly immaterial, unless proof of such system would serve to identify the defendant as the perpetrator of the particular crime charged or was necessary to establish the element of criminal intent. Proof of a common plan or system, therefore, in this connection is merely an evidential means to the end of proving identity or guilty intent, and involves the establishment of such a visible connection between the extraneous crimes and the crime charged as will make evidence of one logically tend to prove the other as charged. If, as we have seen, no such connection was shown to exist between the separate Georgia offenses and the Aiken crime as would constitute them practically "a continuous transaction" (*State v. Weldon,* 39 S. C., 321; 17 S. E., 688; 24 L. R. A., 126), or as would otherwise render this evidence relevant to prove identity, and if, as we have held, the evidence was not competent on the question of intent, it follows that it was not admissible merely to show plan or system. See *Shaffner v. Com.,* 72 Pa., 63; 13 Am. Rep., 651. *State v. Kenny, supra,* and full discussion by Justice Werner in *People v. Molineux, supra.*

We have discussed such exceptions to the general rule as were especially urged by the State as applicable to the case

at bar. If the evidence as to the extraneous Georgia offenses elicited from the witnesses Bell, Bray, and Hammett did not properly fall within either of the exceptions discussed, as we have endeavored to demonstrate, then the evidence was erroneously admitted, and the exceptions assigning error in that regard must be sustained.

The next point strongly urged by appellant is that there was no such competent proof of the genuine handwriting of Lyle as would afford a legitimate basis for his identification by a comparison of handwriting. Many of the exceptions directed to various phases of that contention would seem to be predicated upon the ancient common-law rule that, where a writing in evidence is disputed, the genuine handwriting of the alleged writer, if otherwise irrelevant, cannot be introduced in evidence merely for the purpose of comparison. Other exceptions in this connection make the point that certain of the writings admitted were insufficiently proved or authenticated as standards. The law in this State is thus stated by Chief Justice Simpson in *State v. Ezekiel,* 33 S. C., 116; 11 S. E., 636:

"The rule established in these cases was, that, while comparison of handwriting is inadmissible as an original means of ascertaining the genuineness of a signature or other writing, yet it may be admitted in this State in aid of doubtful proof. Further, that the trial Judge had to decide in the first instance whether sufficient doubt had been raised to authorize the comparison, subject, however, to review on appeal. And, further, that the witnesses making the comparison need not be technical experts. The papers, however, by which the comparison is to be made must be either admitted, acknowledged, or otherwise proved to be in the handwriting of the accused."

See Boman's *Adm'r v. Plunkett,* 2 McCord 518. *Descrow's Assignees v. Farrow,* 3 Rich., 382. *Bennett v. Matthewes,* 5 S. C., 484. *Benedict v. Flanigan,* 18 S. C., 508; 44 Am. Rep., 583. *Graham v. Nesmith,* 24 S. C., 296.

The disputed writing in the case at bar was the signature, "E. P. Gaines," on the forged check. That Lyle wrote that signature was expressly put in issue by his plea of not guilty, taking the form of the sweeping denial embraced in his defense of an alibi. That any competent evidence tending to establish that signature by a comparison of handwriting was in aid of doubtful proof within the meaning of the rule we think is entirely clear.

As to whether the papers were sufficiently authenticated or established as standards was a question primarily for the determination of the trial Court, subject to the rule (*State v. Ezekiel, supra*) that the "papers * * * by which the comparison is to be made must be either admitted, acknowledged, or otherwise proved to be in the handwriting of the accused." The expression "otherwise proved," in the absence of any statute as to method or degree of proof, refers to proof in accordance with the general rules of the common law, and justifies in this connection a somewhat more detailed statement of those rules, of which the sentence quoted from *State v. Ezekiel* is a succinct epitome, The genuineness of a writing for purposes of comparison may be established:

"(1) By the concession of the person sought to be charged with the disputed writing made at or for the purposes of the trial, or by his testimony; (2) or by witnesses who saw the standards written, or to whom, or in whose hearing, the person sought to be charged acknowledged the writing thereof; (3) or by witnesses whose familiarity with the handwriting of the person who is claimed to have written the standard enables them to testify to a belief as to its genuineness; (4) or by evidence showing that the reputed writer of the standard has acquiesced in or recognized the same, or that it has been adopted and acted upon by him in his business transactions or other concerns. * * * In civil cases the genuineness of such a paper must be established by a fair preponderance of the evidence and in

criminal cases beyond a reasonable doubt. Writings proved to the satisfaction of the Court by the methods and under the rules adverted to may be used as standards for purposes of comparison with a disputed writing, subject, however, to the qualification that writings which are otherwise incompetent, should never be received in evidence for purposes of comparison." *People v. Molineux, supra.*

Applying the foregoing principles to the case at bar, we think the papers identified by the Georgia bankers and introduced as a part of the transactions tending to prove the extraneous Georgia offenses were erroneously admitted. The essential relevancy of these writings was to identify the defendant as the perpetrator of the Georgia crimes. Evidence as to those distinct crimes being incompetent under the views herein announced, it is obvious that the effect of these writings, if admitted, could not be confined strictly to the ostensible purpose of serving as a standard for comparison of handwriting. While under our rule a genuine writing, not otherwise relevant, may be introduced in aid of doubtful proof of a disputed writing, if the genuine writing sought to be used as a standard is otherwise incompetent because of its tendency to prove other irrelevant and prejudicial matters, it should not be received for purposes of comparison certainly, where it is not the only standard of writing obtainable. *Gambrill v. Schooley,* 95 Md., 260; 52 Atl., 500; 63 L. R. A., 427. *Hatch v. State,* 6 Tex. App., 384. *Miss. Lumber Co. v. Kelly,* 19 S. D., 577; 104 N. W., 265; 9 Ann. Cas., 449; note 63 L. R. A., 441; 10 R. C. L. p. 996, Sec., 181. In the State of facts here presented, for purposes of comparison of handwriting, therefore, the writings identified by the Georgia bankers in connection with alleged passing other forged checks should have been excluded.

But the contention that the other writings introduced and used for the purpose of comparison were improperly or insufficiently established is untenable.

The witnesses testified they either saw the defendant make the writings introduced or in certain instances that a particular writing was made under cirumstances exclusive of an inference that it could have been made by another than the man they claimed was Lyle, and that it was recognized and acted upon by him in the business in which he was then engaged. There was ample evidential basis for the Circuit Judge's ruling, and it has not been made to appear that it was controlled by error of law. See. 22 C. J., p. 787, § 896; 10 R. C. L., 997, § 183. The exceptions assigning error in this particular must therefore be overruled.

The more material point raised by defendant on this phase of the case is that the undoubtedly genuine handwriting of the defendant on the property book at police headquarters and on the card written after his arrest at the instance of the detective, Whitehead, in his and policeman Goodson's presence, was procured by duress, and that the admission of this paper was tantamount to compelling the accused to furnish evidence against himself. Treated as a confession of guilt, the handwriting was of course, admissible if produced or executed voluntarily. Whether it was so made was a question for the determination of the 'rial Judge in the first instance; ultimately it was for the jury as "the final arbiters of such fact." *State v. Rogers,* 99 S. C., 504; 83 S. E., 971, and cases there cited. The presiding Judge admitted the writing, with the explanation that it would be left to the jury to say whether it was procured by duress. The mere fact that the writing was executed by defendant after his arrest at the request of an officer does not so conclusively establish its involuntary character as to render it inadmissible. *State v. Branham,* 13 S. C., 396. The Court's ruling deprived the defendant of no substantial right. If, as appellant contends in argument, the trial Judge did not follow the explanation made at the time of his ruling with a sufficiently definite instruction to the jury upon this point, such omission does not affirma-

tively appear in the record, nor does it appear that any proper request preferred by defendant on this point was refused. Further, whether under the particular issue here joined the defendant was entitled to invoke the objection that this writing was in the nature of a confession or of incriminating evidence furnished against himself is at least doubtful. Where a person's handwriting is in dispute, such a writing, made *post litem motam,* is so clearly open to the inference that it is a self-serving act rather than a self-incriminating act on the part of the party whose handwriting is in controversy that it is for that reason, as a general rule, inadmissible on behalf of the writer. 10 R. C. L., 998, § 184; 22 C. J., 784, § 887. Here the testimony of the officers to the effect that the defendant voluntarily furnished the genunine specimens of his handwriting is supported by the only inference consistent with his plea of innocence, viz., that the writing was voluntarily furnished to establish that his handwriting was not that of the criminal who uttered the E. P. Gaines check. Certainly, the Judge's finding thereon and his action in leaving this question of duress to the jury were as favorable to the defendant as he was entitled to ask, and all exceptions thereto directed must be overruled. The point that these writings should have been excluded on the ground that they were prepared for purposes of comparison after the prosecution was started, that is, *post litem motam,* is, of course, not available to the defendant. 10 R. C. L. 998, § 184

Under the foregoing views the various exceptions assigning error in admission of the opinion, evidence of Pardue, Durham, and Arial, as experts, based upon the comparison of the specimens of handwriting introduced in the case, are without merit, and must be overruled.

The only remaining point requiring notice in this connection is the error imputed to the presiding Judge in failing to charge a requested instruction to the effect that "evidence as to the genuineness of handwriting

is generally regarded as of a weak and unsatisfactory character," etc. The request was properly refused as a charge on the facts within the purview of the constitutional inhibition. *State v. Smalls,* 98 S. C., 299; 82 S. E., 421. Such other of appellant's exceptions as charge error in the admission of evidence on the grounds that it was irrelevant or that it was hearsay have been carefully examined and found to be hypercritical. They disclose in themselves no reversible error, and are not of such nature as to require special notice or treatment.

This brings us to a consideration of the exceptions assigning error in the exclusion of certain evidence offered by the defendant. Two propositions are advanced: (1) That the trial Court committed prejudicial error in refusing to permit defendant to swear witnesses tendered for the purpose of establishing points of fact vitally essential to the making out of his defense of alibi; and (2) that the Court committed prejudicial error in refusing to permit defendant to introduce evidence as to the good character or reputation of his witnesses who were strangers in Aiken County. A conclusion as to the merits of the exceptions raising the foregoing points may only be reached in the light of a clear understanding of appellant's theory of the case, and of the contentions of fact he sought to establish by competent evidence on the trial below.

Accepting at its face value what the State's case tends to prove, that the crime charged was committed by a sophisticated crook who was a consummately skilled actor, one of an organized band of forgers, appellant's counsel say first, that its commission by the defendant, Lyle, was a moral and intellectual impossibility. In support of that contention of fact they introduced testimony tending to establish that at the time of the commission of the crime charged the defendant was a mere youth of 21 years, born and raised on Sand Mount and Raccoon, in the mountains of Dade County, Ga., whose only schooling had been in a one-teacher school

in the little settlement of Hooker, where he completed the equivalent of the seventh grade at the age of 17 years; that his father died before his birth, and his mother married again; that he lived and worked on the home farm with an aunt until he was 17; that no cotton was raised on this farm or in this section; that J. C. Westberry married his aunt, and that defendant had lived with the Westberrys since 1910; that Westberry was a steam shovel operator, and that in 1918 defendant had left home for the first time, going with Mr. and Mrs. Westberry to Thickety, S. C., where Westberry ran a steam shovel for 5 months on a construction job and Lyle worked with him; that, save for short periods on the home farm, Lyle had worked continuously with Westberry on various construction jobs until December, 1920; that in 1921 he farmed with his uncle, Westberry, on the little farm in Dade County, Ga., except for about 10 weeks spent in Nashville, Tenn., where he took a mechanical course in automobile work; that on December 8, 1921, he went to work as night watchman on the construction job of G. L. Mays, a reputable contractor of Knoxville, Tenn., at Hepzibah, Ga., where J. C. Westberry was operating the steam shovel; that the reputation of young Lyle in his home community as established by witnesses who had known him from his birth was good, "none better"; that his reputation with his employers and among his coemployes since leaving his backwoods home was good; that Lyle knew little of checks and banking, and practically nothing of raising and selling cotton. Hence, as the defense contended, the moral and mental equipment of the defendant for the task, successfully accomplished by the skilled operator, whose knowledge of banking and artistic impersonation of a young cotton farmer had enabled him to dupe six experienced bankers without arousing suspicion, was so utterly inadequate as to place the commission of the crime charged in the indictment beyond the pale of reasonable probability. But, at all events, appellant says, in the second place, the commission of the

crime by Lyle was a physical impossibility, since at the very time of the utterance of the forged check in the office of the Farmers' and Merchants' Bank in Aiken, S. C., Lyle was in Hepzibah, Ga.    According to the State's evidence, the crime charged was committed in Aiken between 9:30 a. m. and 12 o'clock M.  The three banker witnesses who swore that Lyle was the man who passed forged checks to them during the morning of January 12 placed Lyle in Aiken between 9:30 a. m., and 12 m., and two of these placed both Lyle and Westberry in Aiken between those hours.    The establishment of an effective alibi necessarily involved the location of Lyle in Hepzibah during those hours at such definite points of time as would preclude the possibility of a trip to Aiken and return by any possible means of transportation. The distance by dirt road or highway between Hepzibah and Aiken is about 32 miles.    The distance by railroad or air line does not appear.    It seems, however, to have been assumed by the State for the purpose of meeting the evidence as to the alibi that Lyle and Westberry moved, or could have very quickly moved, between Hepzibah and Aiken over the highway by means of a high-powered automobile.    The defense introduced a number of witnesses, the employers, fellow employes of Lyle, and others, who testified unequivocally that Lyle and Westberry were in Hepzibah on and during the morning of January 12, 1922.    The trial Judge undertook to limit the defendant to three witnesses upon each material point of the alibi.    He ruled in substance that, since it was impossible for Lyle to have gone from Hepzibah to Aiken, uttered forged checks in three different banks, and returned within half an hour, each half-hour period in the time from 9:30 until 12 M. would be considered one point, and that upon this one point no more than three witnesses would be allowed; that is, to illustrate, three witnesses would be allowed to cover 9:30, three to cover 10 o'clock, three to cover 10:30 o'clock, etc., up to and including 12 o'clock M. After the defendant had sworn and examined 8 witnesses

who testified that Lyle was in Hepzibah on the morning of
the commission of the crime, the trial Court ruled that each
half-hour period of the time from 9 to 12 had been covered
by at least three witnesses, and declined to allow the defend-
ant to introduce more testimony on that question of alibi.
The defense tendered by name 20 other witnesses "to prove
the whereabouts of the defendant during the time of the day
in question." The ruling of the Court in refusing to receive
the testimony so offered presents the vital point of the appeal
on this branch of the case.

It is at once apparent that the provision of Section
3964, Civil Code 1912, that "in any bill of costs there
shall not be allowed the charge of more than three
witnesses to the proof of any one particular matter of fact,"
affords no authority for a rule of practice so limiting the
number of witnesses to the proof of one point of fact. The
Judge's ruling is to be referred to the general discretionary
power inherent in a trial Court to exclude evidence that is
merely cumulative, and to limit the number of witnesses to
be heard on behalf of either party to establish a single point
or proposition of fact. 16 C. J., 859, §§ 2165 and 2166.
This power to exclude cumulative evidence in reply has been
frequently recognized in this jurisdiction. *State v. Johnson,*
66 S. C., 23; 44 S. E., 58. *State v. Sims,* 16 S. C., 495.
*Caldwell v. Wilson,* 2 Speers, 75. Manifestly however, a
trial Court has no discretionary power to exclude competent
evidence that is not merely cumulative, offered as to a ma-
terial point of fact, the proof of which is essential to the
establishment of a party's cause of action or defense. See
*State v. Price,* 103 S. C., 278; 88 S. E., 295. And where
evidence offered by a defendant in a criminal case is ex-
cluded on the ground that it is merely cumulative, the trial
Court's exercise of discretion in that regard is to be tested
by the fundamental principle of our criminal jurisprudence
that an accused is entitled "to be fully heard in his defense."
Const. 1895, Art. 1, § 18; Section 82, Code Crim. Proc.

1922. And where there is serious doubt as to the admissibility of evidence, the doubt should always be resolved in defendant's favor. 16 C. J., 857, § 2158. *Gambrell v. State,* 92 Miss., 728; 46 South., 138; 17 L. R. A. (N. S.), 291; 131 Am. St. Rep., 459; 16 An. Cas., 147.

Applying the foregoing principles to the question here, we are clearly of the opinion that the Circuit Judge committed prejudicial error in excluding the testimony offered. The defendant was entitled as a matter of substantial right to introduce evidence tending to prove any essential point of an effective alibi. Obviously evidence of this kind is valueless if it does not completely encompass the time within which the crime was or could have been committed as charged. The State's witnesses in the case at bar were unable to fix the precise time of the commission of the crime. It was somewhat vaguely fixed as between 9:30 a. m. and 12 m. Since time was not of the essence of the crime, the jury, in making due allowance for error in this class of testimony, were not limited to a finding that the crime was in fact committed between those hours; they might legitimately have found that it was committed either before 9:30 a. m. or after 12 m. Hence defendant was entitled to meet any such possbile inference from the State's evidence in establishing his defense. Having fixed the limits of time within which the crime could have been committed under the State's evidence, it is equally obvious that "the alibi evidence relied on must be applied to and cover the whole of such period." Burrill on Circumstantial Evidence, p. 511. If in the light of the two controlling circumstances —the distance between the two places and the rapidity with which defendant could have moved from one to the other— the alibi evidence, even if believed, was reasonably open to the inference that the defendant could have been in both places consecutively, it is clear that not even a *prima facie* alibi was established. Certainly defendant was entitled, if he could, to make out such a *prima facie* case as would ex-

clude any reasonable inference that he was or could have been absent from Hepzibah for a sufficient length of time to enable him to be in Aiken at or during the time the offense is proved to have been committed. Whether under the circumstances of this case it was competent for the Circuit Judge to find or assume as a fact that it was impossible for the defendant to have traveled from Hepzibah to Aiken to have committed the crime, and to have returned within a period of 30 minutes, is at least questionable. But, if it be conceded that such assumption was warranted for the purpose of determining the cumulative character of evidence, we think the correctness of the Circuit Judge's holding that each material half-hour period of the time involved had been sufficiently covered by the testimony of at least three witnesses is even more questionable. None of the witnesses produced by defendant undertook to testify that he was with the defendant in Hepzibah all of the time or for any considerable period of time during the morning hours of January 12th—a fact that at least tends to rebut an inference that the alibi evidence upon which defendant relied was a prepared or manufactured product. The testimony of the eight witnesses the defense was permitted to swear was to the effect that each of these had seen the defendant in Hepzibah at or about a certain time or at or about certain times during the morning and about noon of the day in question. That the Judge was mistaken in the view that defendant's alibi witnesses had in fact sufficiently covered each half-hour point of the time involved is substantially admitted by the State's able counsel, who in their printed argument say:

"The defense was an alibi. If the Court be interested in dissecting the same, it will be found that, so far as testimony of the citizens of the town of Hepzibah, Ga., is concerned, there is a complete hiatus in their support of an alibi between say 10:30 a. m. on the morning of January 12, 1922, and say 1:30 o'clock on the same day."

If such hiatus existed, the additional alibi evidence offered by the defendant clearly could not be regarded as cumulative, and the Court's action in excluding it was tantamount to the denial of defendant's right to establish by competent evidence his innocence of the serious criminal charge laid in the indictment. Certainly, if the alibi evidence adduced by defendant was reasonably susceptible of the inference that such "hiatus" in credible testimony did exist, then the evidence introduced was practically worthless, and the defense relied on was not established. Analysis of the testimony does not lead to the conclusion that there was such a gap in the alibi evidence as State's counsel suggest; but, even in the view that each half-hour period between 9:30 a. m. and 12 m. had been nominally covered by three of defendant's witnesses, we are clearly of the opinion that the additional evidence offered may not properly be regarded as cumulative in a sense that would warrant its exclusion. The task of establishing by honest witnesses an alibi that would effectually cover the period of several hours involved in the case at bar was a difficult one. It involved the necessity of excluding at every point the discrediting hypothesis that the defendant could in little more than one hour, certainly, have traveled from Hepzibah to Aiken, committed the crime, and returned. The testimony construed by the Court to cover each material point was of a character easily susceptible of the inference that it was honest, but involved an error of a half hour or more in the witnesses' recollection of the time or period of time to which they testified. In such a case the numerical strength of witnesses whose testimony tends to corroborate the testimony of one another as to vitally material points of the defense is not merely cumulative.

"Every fact * * * which closes up an exit of possible distrust of the testimony, i. e., which prevents or refutes a possible discrediting hypothesis, is a corroborative fact. * * * Moreover, numbers may in themselves signify some-

thing qualitatively, as far as the witnesses on the same side are concerned, and irrespective of opposing assertions." Wigmore, Principles of Judicial Proof, p. 732.

In any view, in establishing a defense of the character here involved the figure of. Mr. Harris (Hints on Advocacy, p. 204) would seem peculiarly applicable:

"One snowflake may not be whiter than another, but an accumulation of flakes gives weight and consistency, and sometimes irresistibility."

The exclusion of the additional evidence offered by defendant to establish his defense of an alibi was error, and the exceptions thereto directed must be sustained.

It is proper to add that, since under the State's theory, based on the evidence, Westberry was present with Lyle at the time of the commission of the offense, and was his partner in crime, it is evident that proof tending to discredit the State's case as to the presence of Westberry on the scene of the crime was likewise highly relevant, and the defense was entitled to practically the same latitude in establishing the whereabouts of Westberry during the hours of the day the crime is alleged to have been committed.

The second point in this aspect of the case is directed to the assignment of error in the exclusion of testimony offered by defendant to prove the good reputation of J. C. Westberry, one of the defendant's important witnesses, who, like the defendant, was a stranger in Aiken County. The defendant offered for that purpose H. J. Dunovant, of Charlotte, N. C., and L. C. Cunter, of Knoxville, Tenn., the latter a native of this State, and well known in Aiken County and vicinity by reason of his family connections, etc., both men of standing and of large business interests, who had known Westberry for years. Under the recent decision of this Court in *Woods v. Thrower,* 116 S. C., 165; 107 S. E., 250; 15 A. L. R., 1062, the evidence offered was clearly admissible. That its exclusion was prejudicial is equally apparent. It was the State's plainly dis-

closed theory that Westberry was the Fagin of young Lyle's skillfully directed career of crime. Proof of the witness Westberry's good reputation for veracity, honesty, and fair dealing was nearly, if not quite, as important in making out the defendant's case as proof of the defendant's own reputation. Indulging, as the law requires, the presumption of innocence in defendant's favor, there is great force in his counsel's contention that the accused in the case at bar labored under a tremendous handicap in having to make out his defense in opposition to well-known and reputable local witnesses, by the testimony of strangers. He was entitled, within reasonable bounds, to establish the good character of his stranger witnesses by introducing pertinent testimony as to their reputations. Since an inquiry of that nature is collateral to the main issue, however, the number of witnesses and the quantity of evidence introduced for such purpose must be left to the sound discretion of the trial Judge. 16 C. J., 859, § 2166. See *Chapman v. Cooley,* 12 Rich., 654. That the trial of a cause involving issues of the character joined in the case at bar may consume much time and greatly tax the patience of Court and jury is true; but that the accused in a criminal prosecution may not be denied time and opportunity to present competent and material evidence offered and to be heard fully in his defense without infringing his constitutional rights is also true. It need scarcely be remarked that in such cases the duty of counsel to assist the trial Court in the elimination of nonessentials to the end that the material issues be fairly and speedily tried is especially apparent and compelling. Since, however, the character evidence offered as to the stranger witness, Westberry, cannot be held to relate to such a collateral and nonessential matter as would warrant its entire exclusion, the exceptions assigning error in that regard must be sustained.

The view taken as to the exceptions which raise the two points disposed of renders unnecessary a detailed considera-

tion of the other exceptions not specifically covered by the foregoing discussion.

For the reasons indicated, the judgment of the Circuit Court is reversed, and a new trial ordered.

New trial.

MESSRS. JUSTICES WATTS, FRASER and COTHRAN concur.

MR. CHIEF JUSTICE GARY dissents.