THIS OPINION HAS
 NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY
 PROCEEDING EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Supreme Court

 
 
 
 The State, Respondent,
 v.
 James A. Summersett,
 Jr., Petitioner.
 
 
 

ON WRIT OF CERTIORARI
 TO THE COURT OF APPEALS

Appeal from Charleston County
 Daniel  F. Pieper, Circuit Court Judge
Memorandum Opinion No.  2008-MO-025
Heard April 1, 2008  Refiled July 28,
 2008  
REVERSED

 
 
 
 Jack
 B. Swerling, of Columbia, and Katherine Carruth Link, of W. Columbia, for
 Petitioner.
 Attorney
 General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant
 Deputy Attorney General Donald J. Zelenka, and Assistant Attorney General
 Melody J. Brown, all of Columbia, and Ralph E. Hoisington, of Charleston, for
 Respondent.
 
 
 

JUSTICE
 PLEICONES:  Petitioner was convicted of murdering his close friend
 Julian Grant a/k/a Dooley and received a life sentence.[1] 
 The Court of Appeals affirmed in an unpublished opinion,[2] and we granted his petition for a writ of certiorari.  We reverse.
FACTS
Petitioner admitted
 that he shot Dooley, but defended on the ground of accident.  The State
 presented evidence from which the jury could have concluded petitioner intended
 to shoot Dooley, as well as evidence that petitioner accidentally shot Dooley
 while intending to shoot Jeremy Hawkins a/k/a Scrooge, Dooleys cousin.  There
 was evidence in the record supporting all three theories, and the case turned
 on witness credibility.
In the late
 afternoon of April 15, 2002, a brawl broke out between petitioners cousin and
 Dooleys brother.  The families were long time neighbors in a Charleston subdivision,
 and the young men were well-acquainted.  A second fight then erupted between
 petitioners brother and Dooleys cousin, Scrooge.  Petitioners brother was
 armed with a baseball bat given him by petitioner, while Scrooge, according to
 some witnesses, used a gun to pistol whip the brother.  Petitioner, who had a
 handgun, admitted approaching the pair and hitting Scrooge, who was winning the
 fight, in the head with the gun.  Petitioner claimed to have pulled the guns
 hammer back before hitting Scrooge, a move designed to keep the gun from
 accidentally firing as it was being used as a bludgeon.
As petitioner began
 hitting Scrooge, Dooley intervened and pushed petitioner away.  According to
 the defense witnesses, after Dooley shoved petitioner, petitioner began to fall
 backwards into a ditch.  Dooley reached out to catch petitioner, but petitioner
 hit the ground, the gun discharged, and the bullet hit Dooley who was in the
 act of reaching/falling towards petitioner.  The States eyewitnesses, in
 contrast, testified that petitioner pointed the gun at Dooley, who was shot as
 he backed up with his hands in the air.  Other prosecution witnesses testified
 that after the shooting petitioner, who was emotionally distraught, left the
 scene but admitted in phone calls that he meant to shoot Scrooge but
 accidentally hit Dooley. 
Dooley
 was shot in the chest and bled to death.  
The
 evidence established that petitioner and Dooley were good friends.  Moreover,
 it established pre-existing animosity between Scrooge and petitioner based upon
 Scrooges affair with petitioners girlfriend/fiancé, and petitioners
 subsequent affair with Scrooges wife.  Animosity existed as well because
 Scrooge had become a federal drug informant.  There was also evidence that
 petitioner had threatened Scrooge with a gun the previous Thanksgiving.
ISSUES
The Court granted
 certiorari to consider three evidentiary issues:

 
 
 1) 
 Whether the Court of Appeals erred in finding no 
 reversible error in the trial courts ruling permitting the State to 
 cross-examine petitioner about his out-of-wedlock children?
 
 
 
 2)
 Whether the Court of Appeals erred in finding no 
 reversible error in the trial courts decision to admit a prior bad 
 act?
 
 
 
 3) 
 Whether the Court of Appeals erred in finding no 
 error in the trial courts ruling admitting rap lyrics containing 
 death threats against Scrooge written, sung, and produced in part by 
 petitioner?
 
 

We
 find the Court of Appeals erred in affirming the first two challenged rulings,
 and reverse and remand for a new trial.  With regard to the rap lyrics and any
 resulting prejudice, their admissibility at petitioners next trial will
 depend, in large part, upon the evidentiary showing made in that proceeding. 
 Accordingly, we do not address the merits of that issue here, but admonish the
 State and the circuit court upon retrial to exercise caution if this issue is
 raised.
Impeachment/Character
 Evidence
On direct
 examination, petitioner testified to his activities on April 15, 2002,
 including references to taking his son Ques to school, and to planning to pick
 him up afterwards as he normally did.  Petitioner explained that he did not
 attend Ques late afternoon baseball game as he normally did because of car
 trouble.  This testimony was offered to explain why petitioner had a baseball
 bat in his automobile which he acknowledged giving to his brother.
The
 States cross-examination of petitioner commenced with this exchange:

 
 
 Q. 
 All right, [petitioner].  By way of 
 background, lets get some clarity on some of these things.  
 You were talking about you have one child?
 
 
 A.     No.
 Q.     You actually have five children;
 dont you?
 A.     Six.
 Q.     Six children?
 A.     Yes.
 Q.     By how many different women?
 A.     Five.
 Q.     So you have six children by five
 different women?
 A.     Yes.
 
 
 Q. 
 Okay.  Have you ever had any of those children 
 while you were in wedlock with your wife?  Did you ever have 
 any children out of wedlock?
 
 

 A.     Im not legally married.
 Q.     Okay.  So you just have children
 ---
 (Petitioners
 Attorney):  Objection.  If we could approach.

A
 bench conference followed during which petitioners attorney objected, saying
 Im aware this is cross-examination but this seems like it is more character
 evidence.  The solicitor responded that his question was proper because (1)
 petitioner put his character on the stand (2) [petitioner had claimed to be]
 good family man with one child and all of the testimony has been about the one
 child and (3) there had [already] been a lot of testimony about adultery in
 the evidence.  Petitioners attorney pointed out, however, that the solicitor
 had not objected to his cross-examination of various States witnesses about
 their adultery, to which the solicitor responded Because it is relevant. 
The judge found the
 solicitors cross-examination proper because petitioner had been portrayed as
 if he is a good person and he only has one child.  The State reinforced the trial
 judges misimpression that petitioner had testified he only had one child: although
 petitioners attorney pointed out petitioner had never so testified, his
 objection to this line of questioning was overruled.  The interrogation
 continued, during which, among other things, the solicitor challenged
 petitioner to name the mothers of his children.
The Court of
 Appeals held that petitioners attorneys objection to the cross-examination
 may have been untimely, and thus the propriety of the cross-examination may not
 have been preserved for appellate review.  We disagree.  The cross-examination
 began with an unusual series of questions and it was not immediately apparent
 that the solicitor was delving into the number of petitioners children and his
 relationship with them and their mothers.  We find the objection was timely.
Next, the Court of
 Appeals found that it was unnecessary to decide whether petitioner put his
 character trait as a good father in issue during his direct examination or
 whether he had merely been testifying to a narrative of events. We find
 petitioner did not put his character as a good father in issue. Moreover, while
 the number of children and mothers is undoubtedly probative of petitioners
 fertility, and may raise doubts about his commitment to societal conventions,
 it sheds no light on whether or not he is a good father to those children.   Even
 if petitioner had put this character trait in issue, the cross-examination was
 not relevant.  
Before
 this Court, the State has taken a different tack, arguing that the evidence was
 elicited not as character evidence but rather to impeach petitioners
 testimony.  We are unable to discern what in petitioners direct testimony was
 impeached by the evidence of his six out-of-wedlock children and their mothers
 names.
The ultimate ruling
 by the Court of Appeals was that any error in permitting this testimony was
 harmless in light of the other evidence of petitioners promiscuity, that is,
 that petitioner had had a sexual relationship with Scrooges wife.  We are not
 confident that a single adulterous relationship equates to promiscuity in the
 same sense that fathering six children by five different women does, and thus do
 not agree that this evidence was harmless because it was merely cumulative to
 other evidence of promiscuity.
In short,
 petitioner did not put his character as a good father in issue, nor is evidence
 that he has fathered six children by five mothers probative whether he is, in
 fact, a good father.  Further, adultery with a married woman does not make one
 promiscuous as that term is commonly understood and thus the evidence of
 petitioners out-of-wedlock children was not cumulative to the evidence of his
 adultery.  The States cross-examination was not designed to elicit any evidence
 probative either of petitioners guilt or of his credibility, but rather was
 intended solely to paint him as a person who does not respect societal norms,
 and to suggest that he was an irresponsible individual who did not even know
 the names of his childrens mothers.  The circuit court erred in allowing this
 questioning, and the Court of Appeals erred in deeming it cumulative.  We
 find both error and prejudice.  We need not decide, however, whether this error
 alone would warrant reversal in light of a second erroneous evidentiary ruling by
 the trial court.
Other Bad Acts
As
 mentioned above, the State presented two different theories: either petitioner
 intentionally shot Dooley, or Dooley was hit as petitioner targeted Scrooge. 
 Petitioners defense theory was accident; that is, that the gun discharged
 accidentally when he hit the ground as he fell backwards. 
In 1993, petitioner
 fired a shot which struck an acquaintance of petitioners, Ernest Riley, in the
 foot.  Petitioner was charged with assault and battery with intent to kill in
 connection with that shooting, and eventually pled nolo contendre to the
 charge.  The State sought to introduce evidence of this event under Rule
 404(b), SCRE and State v. Lyle, 125 S.C. 406, 118 S.E. 803 (1923), to
 show the absence of accident or mistake in the Dooley shooting.  
The
 issue arose after attorney Thrower testified as a defense witness to
 post-shooting telephone conversations on April 15 in which petitioner
 maintained he had accidentally shot and killed Dooley.  Before beginning
 Throwers cross-examination, the State sought a ruling whether it could examine
 Thrower about the Riley case in which he had represented petitioner.  The State
 maintained the Riley shooting was probative of petitioners current claim of
 accident because he had previously claimed that the shooting of Riley, also an
 acquaintance, was likewise an accident.  Petitioners counsel protested that,
 among other things, in this case petitioner claimed to have accidentally fired
 the gun, while in the Riley case he admitted intentionally shooting at the
 ground, but that Riley was accidentally injured when the bullet ricocheted and
 hit his foot.  Moreover, the State argued similarity in that both shootings
 took place in the Orleans Wood subdivision, in both cases petitioner fled from
 the scene, and in both cases he subsequently maintained in phone conversations
 that the shooting was accidental.  Petitioners attorney protested that these
 were completely separate incidents, and that petitioner was not using
 accident in its legal meaning.  The judge eventually ruled that the Riley
 shooting admissible to show an absence of mistake or accident in the Dooley
 shooting.
Thrower then
 testified before the jury to the facts, as he recalled them, surrounding the
 1993 Riley shooting, but his recollection was vague.  The State later called
 Riley.  He testified that petitioner had gotten in a fight with Rileys
 fiancées sister and pulled a gun on her.  Riley confronted petitioner about
 this incident, and two days later petitioner confronted Riley, and pulled a
 gun on him, pointing it at Rileys head.  Riley testified he told petitioner to
 go ahead and kill him, since everyone knew petitioner carried a little .22
 that would usually crap on him and therefore was not afraid.  In fact, it was
 as petitioner was pointing the gun down that it fired: the bullet hit the
 ground and ricocheted up, hitting Riley in the heel.
The Riley shooting
 is not probative whether the Dooley shooting was an accident, intentional, or
 unintentional.  The facts of these two shootings are not analogous to a
 situation where, for example, a man who is on trial for shooting and killing
 his second wife claims accident, having previously accidentally shot and
 killed his first spouse.  Here, there is no logical relevance between the two
 shootings. State v. Lyle, supra; State v. Braxton, 343
 S.C. 629, 541 S.E.2d 833 (2001).
The admission of
 the Riley shooting was prejudicial error and the Court of Appeals erred in
 deferring to the trial judges discretion in admitting this evidence.  This
 error alone, but especially in combination with the improper cross-examination
 of petitioner, requires we grant a new trial on both charges.  Accordingly, the
 decision of the Court of Appeals affirming petitioners convictions and
 sentence is
REVERSED.
TOAL,
 C.J., MOORE, WALLER and BEATTY, JJ., concur.

[1] He was also convicted of possession of a firearm during the commission of a
 crime of violence but received no separate sentence.
[2] State v. Summersett, Op. No. 2005-UP-373 (S.C. Ct. App. filed June 10,
 2005) (App. pp. 819-827).