761 S.E.2d 770

The STATE, Respondent,

v.

Michael D. WILLIAMS, Appellant.

Appellate Case No. 2012–212501.

No. 5249.

Court of Appeals of South Carolina.

Heard June 3, 2014.

Filed July 23, 2014.

Appellate Defender David Alexander, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Assistant Attorney General Mary Shannon Williams, both of Columbia, for Respondent.

KONDUROS, J.

Michael D. Williams was convicted of two counts of first-degree criminal sexual conduct (CSC) with a minor and five counts of committing a lewd act upon a child. The trial court sentenced him concurrently to twenty-five years' imprisonment for CSC and fifteen years' imprisonment for lewd act upon a child. Williams appeals his convictions and sentence, arguing the trial court erred in excluding evidence the stepbrother of one of the victims sexually abused her. We affirm.

**FACTS**

At trial, Susan Rowles (Mother) testified two of her children, Victim One and Victim Two (collectively, Victims), started attending daycare in 2003 at Williams's home.[1] Mother stated she developed a friendship with Williams and his wife. According to Mother, Victims left Williams's daycare "[i]n late 2005 or 2006" for financial reasons, but Victim Two returned to Williams's daycare in 2006. Mother also stated Victim One did not return to Williams's daycare, but she occasionally visited Williams's home. According to Mother, in 2008, Victim Two told her she had been inappropriately touched at Williams's daycare. Mother stated she contacted her ex-husband (Father) about the allegation but did not ask Victims further questions about the incident.

Mother testified that in October 2008, Victim Two attended the South Carolina Department of Mental Health Assessment

---

1. At the time of trial, Victim One was seventeen years old and Victim Two was eleven years old.

and Resource Center (ARC)[2] in Columbia for a forensic interview. According to Mother, Victim One did not receive an ARC interview. Mother testified she took Victim Two to the ARC interview and completed an intake form prior to the interview. According to Mother, she answered all of the questions on the form truthfully. Mother testified she checked no to the question: " 'Has there ever been a child abuse investigation involving this child or the family before[?]' " She also testified there had not been a prior investigation on Victim 2.

Williams's counsel asked to approach, and the trial court held a bench conference.[3] Thereafter, trial counsel placed on the record his arguments and the trial court's ruling on the ARC intake form, which the trial court apparently made at the time of a bench conference during Mother's testimony. Trial counsel argued:

> Judge, this is a document that is used when someone goes for an ARC interview and [Mother] was the reporter, filled it out in her own handwriting. On question number five it says, "Has there ever been a child abuse investigation involving this child or family before? If yes describe," and [Mother] answered no. My intent at that time was to go ahead and impeach her about the events that we discussed yesterday that actually are not on the record yet. . . .

Trial counsel then explained that in April 2004, DSS reported to the Fairfield County Sheriff's Department that Victims' stepbrother (Stepbrother) "admitted to requiring or forcing [Victim One] to have oral sex with him over a period of time." According to trial counsel, the sheriff's department investigated the incident and, after discussing it with the family, the family decided to "handle the matter internally." Trial counsel asserted "that conduct is very relevant in this case because [Victim One] at the age of eight or nine was exposed ... to sexual abuse." Counsel argued the evidence was admissible

---

**2.** According to its website, "[t]he ARC is a non-profit child abuse evaluation and treatment center." *About ARC,* S.C. Dep't of Mental Health, http://www.state.sc.us/dmh/arc/about.html (last visited June 24, 2014).

**3.** This bench conference was not included in the record on appeal.

to show that a child at the age of eight or nine goes through incredible psychosexual changes, psychological changes[,] which could affect her in her development and would have an impact on this case. Also it shows that she would have a source of knowledge about sexual activity independent completely of whatever she alleges ... Williams did.... [W]hat I'm seeking to do now is use that information for impeachment purposes since the document was not answered truthfully because there was, in fact, an investigation involving the family before.

The State replied that it did not dispute the facts of Stepbrother's abuse as stated by trial counsel. The trial court then noted it had previously sustained the State's objection to trial counsel's request to impeach Mother with the evidence of Stepbrother's abuse, finding the evidence

was not relevant at least at this time, that it would be a collateral impeachment, that [Mother] did answer the question by saying that how she had answered-how she had answered that questionnaire, and I think that whether or not it was truthful or not has not been shown to be relevant at this stage. That was the ruling at the [sidebar] and it continues to be the ruling on the record.

Victim Two testified Williams touched her inappropriately on several occasions, beginning when she was four years old. One incident occurred when she was sitting on Williams's lap while he was sitting in a chair playing on the computer. Victim Two stated Williams touched her on top of her "private part." Another incident occurred in Williams's bedroom when Victim Two and another girl were lying on a bed with Williams watching television. According to Victim Two, Williams put his hand down her pants and touched the top of her private part. Victim Two further provided that on another occasion, Williams was wearing "short orange shorts" and "his thing fell out of [his] pants and [she] saw it." Finally, Victim Two described an incident when Williams

told [her] to get down on [her] knees and [she] was beside him on [her] knees on the floor and he was in the chair and he was wearing those short orange shorts and [his penis] fell out and he told [her] to stick it back into his shorts, but

after that there was like this stuff that came out [of his penis].

Victim Two explained she first reported Williams's abuse in 2008 when Victim One asked her if Williams had ever touched her, and she told her he had. According to Victim Two, Victim One then reported the abuse to Mother. On cross-examination, Victim Two testified she never discussed the abuse with Victim One until 2008. Victim Two further stated Williams touched her "inside [her] private part" five times.

Victim One testified Williams also sexually abused her. According to Victim One, Williams touched her inappropriately "[m]ore than one time." Victim One explained one incident occurred in Williams's pool; Williams "was just kind of holding [her] a little bit and then he put his finger down [her] bikini, then he put his finger inside [her]." Victim One further explained Williams put his finger inside her vagina on at least two other occasions.

On cross-examination, Victim One stated her abuse occurred from 2003 to 2006. Victim One admitted she did not disclose the abuse when Victim Two returned to Williams's daycare in 2006. Victim One further admitted she did not reveal Williams digitally penetrated her in her initial statement to police. According to Victim One, she finally disclosed the abuse in September 2008. Victim One testified Shanay Moore, an abuse and neglect investigator with DSS, interviewed her about the incidents. According to Victim One, she told Moore that Williams touched her vagina at least five times from the age of eight or nine years old. Victim One, however, admitted she did not tell Moore that Williams digitally penetrated her in the swimming pool. According to Victim One, she told Moore that on another occasion Williams put his finger inside her vagina "for over an hour."

Moore testified she investigated Williams's daycare in 2008 in response to an allegation. According to Moore, Williams denied touching Victim Two inappropriately, but he admitted he "tickled and pinched [Victims] on the inside of their thigh area for fun." Moore took a statement from Victim One.

On cross-examination, Moore stated Victim One told her Williams rubbed her vagina in a swimming pool. Moore further stated Victim One told her Williams once inserted his

finger into her vagina for one hour while she was asleep. Moore indicated she was familiar with the ARC intake form. Moore testified it was important for DSS to know about prior familial abuse during an investigation. The State objected, arguing trial counsel was attempting to elicit evidence about the prior abuse by Stepbrother and this evidence was irrelevant. The trial court allowed trial counsel to question Moore outside the jury's presence.

Moore testified in camera getting a history of sexual abuse inside the family was important because it helped DSS determine if the allegations of abuse were true. Moore also explained Father disclosed Stepbrother's abuse to DSS. The trial court sustained the State's objection to testimony about whether familial abuse history was important, finding the evidence irrelevant and "[more] prejudicial than probative."

Heather Smith, a forensic evaluator, testified she conducted an interview with Victim Two in October 2008 at the ARC. Smith explained the purpose of a forensic interview "is for fact finding" to gather information for law enforcement and DSS to conduct their investigation. Smith testified in camera it was important to know whether a victim had a history of abuse, so she can question the victim about the prior abuse in the forensic interview. Smith explained that at the time she interviewed Victim Two, she was unaware Victim One was sexually abused by Stepbrother in 2004. Smith further stated had she known about Stepbrother's prior sexual abuse, she would have "most likely" asked Victim Two whether she witnessed the abuse. Likewise, Smith stated she would have possibly asked Victim Two if she had discussed Stepbrother's abuse with Victim One. Smith, however, explained she asked Victim Two whether she had been abused by anyone other than Williams, and she stated she had not. Moreover, Smith testified that even if she were aware of Stepbrother's abuse, she would not have asked "specifically whether [Victim Two] had been touched by a specific person," but would have kept her questions general and "open-ended" to get a narrative from the child. Smith, however, admitted she was unable to inquire as to Stepbrother's abuse because she did not have that information at the time of her interview. When asked whether Victim Two indicated the source of her sexual knowledge, Smith replied, "[Victim Two] was very consistent with it

all had to do with one person. She did not have other people that she named or described do things to her, it all centered around one person."

Thereafter, trial counsel renewed his request to introduce evidence regarding Stepbrother's prior abuse and Mother's failure to disclose the abuse on the ARC intake form. Trial counsel argued the evidence "would have been important for ... Smith because ... she would have developed questions about whether [Victim Two] ever observed anything in 2003[and] 2004, whether [Stepbrother had] ever done anything to her, and whether or not there had been any discussions about that kind of sexual activity." Trial counsel further argued Stepbrother's sexual abuse occurred during the same time the allegations against Williams occurred. Trial counsel offered to stipulate to evidence a report was made in 2004, was investigated, and was determined to be accurate. Trial counsel stated he did not intend to go into "the gory details ... just the event itself."

The State argued the evidence was not relevant because Smith stated she did not ask leading questions during her interview; therefore, the evidence would not have come out during the interview because Child Two denied being assaulted by anyone other than Williams. The State also argued Williams was offering the evidence as a "back door way" around the Rape Shield Statute.[4] Furthermore, the State asserted the jury could confuse the issues because the abuse happened to Victim One, yet Smith's interview concerned Victim Two. Trial counsel responded he did not intend to use the evidence to "impugn" Victim One's chastity; rather, he intended to use it "for impeachment purposes, or to show source of knowledge."

The trial court ruled the evidence was inadmissible. It found the evidence was barred by the Rape Shield Statute and the prejudicial effect of the evidence outweighed the probative value. Thereafter, the jury convicted Williams of two counts of first-degree CSC with a minor and five counts of committing a lewd act upon a child. The trial court sentenced him concurrently to twenty-five years' imprisonment for each

---

4. S.C.Code Ann. § 16–3–659.1 (2003).

count of CSC and fifteen years' imprisonment for each count of lewd act upon a child. This appeal followed.

## STANDARD OF REVIEW

"In criminal cases, an appellate court sits to review only errors of law, and it is bound by the trial court's factual findings unless they are clearly erroneous." *State v. Black,* 400 S.C. 10, 16, 732 S.E.2d 880, 884 (2012). "The admission or exclusion of evidence is left to the sound discretion of the trial [court], whose decision will not be reversed on appeal absent an abuse of discretion." *Id.* (internal quotation marks omitted). "An abuse of discretion occurs when the trial court's ruling is based on an error of law or, when grounded in factual conclusions, is without evidentiary support." *Id.* (internal quotation marks omitted).

## LAW/ANALYSIS

### I. Prior Sexual Knowledge

Williams argues the trial court erred in excluding evidence of Stepbrother's prior sexual abuse of Victim One. Relying on *State v. Grovenstein,*[5] Williams contends the evidence was admissible to show an independent source of Victim Two's sexual knowledge and the danger of unfair prejudice from the evidence did not outweigh its probative value. We disagree.

"Evidence which is not relevant is not admissible." Rule 402, SCRE. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403, SCRE.

---

5. 340 S.C. 210, 219, 530 S.E.2d 406, 411 (Ct.App.2000) (holding "evidence of a child victim's prior sexual experience is relevant to demonstrate that the defendant is not necessarily the source of the victim's ability to testify about alleged sexual conduct").

■■ "A trial [court]'s decision regarding the comparative probative value and prejudicial effect of evidence should be reversed only in 'exceptional circumstances.'" *State v. Lyles,* 379 S.C. 328, 338, 665 S.E.2d 201, 207 (Ct.App.2008) (internal quotation marks omitted). "A trial [court]'s balancing decision under Rule 403 should not be reversed simply because an appellate court believes it would have decided the matter otherwise because of a differing view of the highly subjective factors of the probative value or the prejudice presented by the evidence." *Id.* at 339, 665 S.E.2d at 207 (internal quotation marks omitted). "If judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal." *Id.* (internal quotation marks omitted).

■ Under the Rape Shield Statute,

Evidence of specific instances of the victim's sexual conduct, opinion evidence of the victim's sexual conduct, and reputation evidence of the victim's sexual conduct is not admissible in prosecutions [for CSC;] however, evidence of the victim's sexual conduct with the defendant or evidence of specific instances of sexual activity with persons other than the defendant introduced to show source or origin of semen, pregnancy, or disease about which evidence has been introduced previously at trial is admissible if the judge finds that such evidence is relevant to a material fact and issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.

S.C.Code Ann. § 16–3–659.1(1) (2003). However, " 'the Rape Shield Statute d[oes] not bar evidence of a victim's sexual conduct if the evidence [i]s offered for a purpose other than to attack the victim's morality.'" *State v. Grovenstein,* 340 S.C. 210, 216, 530 S.E.2d 406, 409 (Ct.App.2000) (quoting *State v. Lang,* 304 S.C. 300, 301, 403 S.E.2d 677, 678 (Ct.App.1991)).

In *Grovenstein,* the defendant appealed his convictions of CSC, arguing the trial court erred in excluding evidence the victims were previously accused of sexual misconduct similar to the conduct the victims alleged against the defendant. 340 S.C. at 213, 530 S.E.2d at 408. At trial, the victims testified the defendant anally penetrated them with his penis and with rolled-up paper. *Id.* The defendant attempted to offer evi-

dence that before the victims met the defendant, they were accused of inserting objects into a young girl's vagina and rectum. *Id.* The defendant argued the evidence was admissible to impeach the victims and to demonstrate the victims had knowledge of sexual matters of this nature. *Id.* at 214, 530 S.E.2d at 408. The State moved to exclude the evidence pursuant to the Rape Shield Statute. *Id.* The trial court ruled the evidence inadmissible, finding it irrelevant, more prejudicial than probative, and an improper attack on the victims' character. *Id.*

On appeal, the issue before this court was "whether the prior sexual experiences of a child victim are admissible despite the Rape Shield Statute to prove a source of the victim's sexual knowledge other than the alleged experiences with the defendant." *Id.* at 216, 530 S.E.2d at 409. This court held "evidence of a child victim's prior sexual experience is relevant to demonstrate that the defendant is not necessarily the source of the victim's ability to testify about alleged sexual conduct." *Id.* at 219, 530 S.E.2d at 411.

However, our court cautioned "the admission of this type of evidence is still subject to a determination" under Rule 403, SCRE, as to "whether the prejudicial effect of the evidence outweighs its probative value." *Id.* We noted the evidence the victims were accused of, inserting objects into a young girl's vagina and rectum prior to meeting the defendant, should have been admitted because it provided an alternate explanation of how the victims would be familiar with the sexual conduct they alleged the defendant committed. *Id.* at 220, 530 S.E.2d at 412. Furthermore, our court noted that because the State emphasized in its closing argument the inference that the victims' sexual knowledge was based on their experience with the defendant, and because the defendant maintained the allegations were untrue, it was critical for the defendant to show the victims possessed the knowledge necessary to fabricate the allegations. *Id.* Likewise, the court found this evidence "was even more significant" because "the case depended primarily on a credibility determination between [the defendants] and the victims." *Id.* The court also found the danger of unfair prejudice did not outweigh the probative value of the evidence. *Id.* Initially, this court noted "this [wa]s not a typical case in which a child victim would have to recount in

detail incidents where he was subjected to sexual abuse";
rather it "involve[d] allegations that the victims had previously
been the perpetrators of sexual abuse on a young girl." *Id.* at
220–21, 530 S.E.2d at 412. Despite the potential the allega-
tions could impugn the victim's character, this court found the
trial court could eliminate this effect with an instruction
limiting the evidence's admissibility for the sole purpose of
establishing an alternate explanation for the victim's sexual
knowledge. *Id.* at 221, 530 S.E.2d at 412.

We find the present case distinguishable from *Grovenstein.*
Unlike *Grovenstein,* the evidence Williams sought to admit did
not provide an alternate explanation as to how Victims were
familiar with the sexual conduct they alleged Williams commit-
ted because the allegations against Williams were not similar
to Stepbrother's prior sexual abuse of Victim One. Williams
was accused of digitally penetrating Victims; whereas, Step-
brother allegedly forced Victim One to perform oral sex.
Unlike the situation in *Grovenstein* in which the sexual abuse
the defendant sought to admit was nearly identical to the
allegations against the defendant, the fact that Victim One was
previously forced to perform oral sex would not show a source
of Victim One's ability to testify about the defendant's acts of
digital penetration. Moreover, Williams's argument the evi-
dence would have "raised the possibility that [Victim Two]
learned about sexual activity either from [Victim One] or even
Stepbrother," is speculative because no testimony was pre-
sented at trial Victim Two knew about Victim One's abuse by
Stepbrother. Furthermore, Smith testified Victim Two told
her she had not been sexually abused by anyone other than
Williams, and that Victim Two's sexual knowledge resulted
from her experiences with one person. Thus, the probative
value of the evidence of Stepbrother's abuse was very low.
Admittedly, the danger of unfair prejudice from the evidence
is lower than the evidence in *Grovenstein* because the evi-
dence does not accuse Victims of committing a sexual act on
another. Nevertheless, the evidence could have confused the
issues at trial or misled the jury as to the sexual misconduct in
question. Specifically, the jury could have become confused
by the fact that Stepbrother's prior sexual abuse was against
Victim One, yet Williams intended to use the information to
show Victim Two's interview was flawed and as a source of

Victim Two's sexual knowledge. Considering the low probative value of the evidence, we do not find exceptional circumstances that warrant reversal of the trial court's finding the prejudicial value of the evidence substantially outweighed its probative value. *See* Rule 403, SCRE (noting "relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury"); *Lyles*, 379 S.C. at 338, 665 S.E.2d at 207 (stating "[a] trial [court]'s decision regarding the comparative probative value and prejudicial effect of evidence should be reversed only in 'exceptional circumstances' " (internal quotation marks omitted)); *id.* at 339, 665 S.E.2d at 207 ("A trial [court]'s balancing decision under Rule 403 should not be reversed simply because an appellate court believes it would have decided the matter otherwise because of a differing view of the highly subjective factors of the probative value or the prejudice presented by the evidence." (internal quotation marks omitted)).

## II. Collateral Impeachment

■ Additionally, Williams asserts the evidence of Stepbrother's abuse of Victim One was admissible to impeach Mother's testimony that she answered all the questions on the ARC intake form truthfully, thus, demonstrating Mother lied on the intake form and testified falsely at trial. Williams maintains the evidence was not collateral because "[it] was not offered solely on the issue of credibility but concerned a central point of the case: the [Victims]' sexual knowledge and the integrity of the investigation." We disagree.

■ "When a witness denies an act involving a matter collateral to the case in chief, the inquiring party is not permitted to introduce contradictory evidence to impeach the witness." *State v. Beckham*, 334 S.C. 302, 321, 513 S.E.2d 606, 615 (1999). Whether a matter is collateral to the issues involved is determined by the answer to this question:

Would the cross-examining party be entitled to prove the fact as a part of, and as tending to establish, his case? If he would be allowed to do so, the matter is not collateral; but, if he would not be allowed to do so, it is collateral. Collater-

al matters, in this sense, are such as afford no reasonable inference as to the principal matter in dispute.

*State v. Brock*, 130 S.C. 252, 254–55, 126 S.E. 28, 29 (1925) (internal quotation marks omitted).

 "[T]he sole object of the rule against impeachment on collateral matters is to prevent confusion of issue and unfair surprise." *State v. Williams*, 263 S.C. 290, 302, 210 S.E.2d 298, 304 (1974). "[T]he cross-examining party is concluded by the answer which a witness gives to a question concerning a collateral matter, and no contradiction will be allowed even for the purpose of impeaching a witness." *Id.* (internal quotation marks omitted). Because of the difficulty in deciding what matters are collateral, "considerable latitude and discretion should be allowed the trial [court] in determining the admissibility of impeaching testimony." *Id.*

In *State v. DuBose*, the defendant was charged with manufacturing marijuana. 288 S.C. 226, 229, 341 S.E.2d 785, 787 (1986). On cross-examination, the State was allowed to question the defendant concerning an alleged conversation with a former next-door neighbor. *Id.* at 230, 341 S.E.2d at 787. The defendant specifically denied telling the neighbor he had grown marijuana. *Id.* Thereafter, the State called the neighbor as a reply witness to testify that eleven years before trial, "[The defendant] said ... he was growing marijuana out on his farm and that he would not be caught." *Id.* at 230–31, 341 S.E.2d at 788. The defendant objected to this line of questioning, arguing it inquired into matters collateral to the State's case in chief, but the trial court overruled the objection. *Id.* at 231, 341 S.E.2d at 788. The supreme court found the reply testimony inadmissible because it pertained to a collateral matter. *Id.* In finding the evidence was collateral, the supreme court noted the evidence the State sought to introduce was a prior inconsistent statement made by the defendant eleven years before trial, which could not have been presented by the State in its case in chief because it concerned a prior bad act that did not fit under a *Lyle*[6] exception. *Id.*

We find the trial court did not abuse its discretion in refusing to allow Williams to impeach Mother's testimony with

---

6. *State v. Lyle*, 125 S.C. 406, 118 S.E. 803 (1923).

evidence of Stepbrother's abuse of Victim One. *See State v. Black*, 400 S.C. 10, 16, 732 S.E.2d 880, 884 (2012) (stating "[t]he admission or exclusion of evidence is left to the sound discretion of the trial [court], whose decision will not be reversed on appeal absent an abuse of discretion"); *Williams*, 263 S.C. at 302, 210 S.E.2d at 304 (recognizing "considerable latitude and discretion should be allowed the trial [court] in determining the admissibility of impeaching testimony"). Here, Williams sought to impeach Mother's testimony that she answered all the questions on the ARC intake form truthfully. According to Williams, the evidence of Stepbrother's abuse of Victim One was admissible "for impeachment purposes since the [intake form] was not answered truthfully because there was, in fact, an investigation involving the family before." This argument is without merit because Williams's attempted impeachment concerned evidence collateral to the material issues at trial. *See Beckham*, 334 S.C. at 321, 513 S.E.2d at 615 (stating "[w]hen a witness denies an act involving a matter collateral to the case in chief, the inquiring party is not permitted to introduce contradictory evidence to impeach the witness").

The case at bar is similar to *DuBose*, in which the supreme court found reply testimony was collateral because it would have been inadmissible in the State's case in chief. *See DuBose*, 288 S.C. at 231, 341 S.E.2d at 788. As previously stated, the trial court did not err in excluding evidence of Stepbrother's prior abuse because it did not provide an alternate source of Victim One's knowledge of the sexual acts in question. Thus, the evidence of Stepbrother's abuse of Victim One was collateral because it would have been inadmissible in Williams's case in chief. Stated differently, Stepbrother's abuse of Victim One was not directly relevant to the ultimate issue in the trial—Williams's guilt or innocence—therefore, Williams was not allowed to introduce extrinsic evidence to impeach Mother's testimony regarding her answers to the ARC intake form. *See State v. Mizell*, 332 S.C. 273, 274, 282–83, 285, 504 S.E.2d 338, 339, 343–45 (Ct.App.1998) (finding in prosecution for CSC with a minor, reply testimony of a social worker that the defendant's wife, who was the victim's mother, had cancelled several appointments with DSS to see the victim, was collateral and was therefore inadmissible to im-

peach the wife because the wife's failure to meet scheduled visits was not directly relevant to the issue of the defendant's guilt or innocence of the crimes charged). Because evidence of Victim One's prior abuse by Stepbrother was collateral to the material issue at trial, the trial court did not err in refusing to allow Williams to introduce contradictory evidence to impeach Mother.

## CONCLUSION

Based on the foregoing, the trial court did not abuse its discretion in excluding the evidence regarding Stepbrother's sexual abuse of Victim One. Accordingly, the trial court is

**AFFIRMED.**

WILLIAMS and LOCKEMY, JJ., concur.