# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Kenneth Lamont Robinson, Jr., Appellant.

Appellate Case No. 2018-001269

Appeal From Charleston County
Kristi Lea Harrington, Circuit Court Judge

Opinion No. 5960
Heard March 17, 2022 – Filed January 11, 2023

## AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

John H. Blume, III, of Cornell Law School, of Ithaca,
New York; Appellate Defender Susan Barber Hackett, of
Columbia; and Public Defender Megan Sara Ehrlich, of
Charleston; all for Appellant.

Attorney General Alan McCrory Wilson, Chief Deputy
Attorney General W. Jeffrey Young, Deputy Attorney
General Donald J. Zelenka, Senior Assistant Deputy
Attorney General Melody Jane Brown, Assistant
Attorney General Tommy Evans, Jr., all of Columbia;
and Solicitor Scarlett A. Wilson, of Charleston; all for
Respondent.

**WILLIAMS, C.J.:**  In this criminal appeal, Kenneth L. Robinson, a juvenile, appeals his convictions for murder and attempted murder.  Specifically, Robinson argues the trial court erred in (1) refusing to remand jurisdiction to the family court, (2) admitting gang-related evidence throughout trial, (3) failing to instruct the jury on the lesser-included offense of voluntary manslaughter, (4) failing to instruct the jury to consider Robinson's age during its deliberations, and (5) sentencing Robinson to fifty years' imprisonment.  We affirm in part, reverse in part, and remand.

## FACTS/PROCEDURAL HISTORY

Shortly after midnight, in the early morning hours of May 10, 2015, Richard Simmons contacted the North Charleston Police Department to report gunshots.  While Simmons was talking to Robinson, Kelly Green, and Latrell Hamilton outside of Robinson's home, a moving vehicle fired at the group.  None of the men were wounded, but Simmons's car was damaged.  An officer responded to the scene, collected evidence, and then left not long after he arrived.  Simmons, Robinson, Green, and Hamilton then began calling their friends, whom they knew had guns, to come to Robinson's house to prepare for another shooting should one occur.  At trial, Simmons testified that Keon Anderson, Robinson's uncle, Derrontae Holmes, and two other men responded to their calls and showed up with guns.

At roughly 1:30 A.M., while the men stood in Robinson's yard conversing, occupants of another car shot in close proximity to the men;[1] however, according to Simmons, the shots were not fired directly at them.  All the men jumped into three separate cars to chase their assailants.  Simmons, Robinson, and Anderson all got into the same car, a Honda CR-V, and all three were armed.  Simmons drove, Robinson was in the front passenger seat, and Anderson was in the right rear passenger seat.

While patrolling the neighborhood, the posse spotted an unfamiliar Chrysler 300, and someone shot at the vehicle.  A car chase ensued as the Chrysler 300 attempted

---

[1] There is confusion in the record as to whether the second shooting was a drive-by or whether the assailants were on foot.  Simmons testified the shots came from a vehicle, but he did not see the vehicle.  Others testified that the shooters were on foot.

to escape. The chase lasted roughly ten and a half miles,[2] and two of the vehicles dropped out of the chase because the Chrysler 300 was much faster. After losing sight of the Chrysler 300 and searching for a short time, Simmons pulled up beside an identical Chrysler 300 stopped at a traffic light. Over objection from Robinson and Anderson, Simmons shot several times into the driver's side door of the Chrysler. Simmons even stated he had to push Robinson out of the way to fire the gun. Although Simmons fired his own weapon at the car, he had to retrieve it from Robinson who was using it because Robinson's gun was out of bullets. Inside the mistaken Chrysler was Kedena Brown (Victim). She died from two gunshot wounds—one to the left side of her head and one to the left side of her throat. Police arrested Robinson for the murder several days later.

As a juvenile, the family court initially held jurisdiction over Robinson, but the State moved to transfer jurisdiction to Charleston County General Sessions court. After a hearing, the family court issued an order that determined it was in the best interest of Robinson and the public that he be tried as an adult. In the court's order, it evaluated Robinson's case under the *Kent*[3] factors and determined the factors militated towards a transfer of jurisdiction. After the transfer, a Charleston County grand jury indicted Robinson for murder and four counts of attempted murder.

Thereafter, Simmons, who was adamant Robinson was the shooter throughout the investigation of Victim's death, confessed he was the triggerman. Robinson, arguing this was newly-discovered evidence, filed a motion with the trial court seeking a transfer of jurisdiction back to the family court. Robinson claimed that because he was not the shooter, his culpability in Victim's murder was diminished. He argued this critical fact was in dispute when the family court made its decision, and had this fact been known to the family court, it would have been more likely to retain jurisdiction over his case. The trial court refused to transfer jurisdiction, finding the family court's transfer order articulated all the relevant *Kent* factors and that this new fact alone was insufficient evidence to warrant a transfer.

Prior to his trial, Robinson argued to suppress all evidence that associated him with a gang pursuant to Rule 404(b), SCRE. The State's theory for introducing such

---

[2] It was disputed whether the occupants of the Chrysler were shooting back at the three cars during the chase. Simmons claimed he never saw shots fired from the Chrysler. Anderson testified to the contrary. The Chrysler was pulled over shortly after the chase and no guns were found in the car, but two of the Chrysler's occupants tested positive for gunshot residue several hours after their arrest.

[3] *Kent v. United States*, 383 U.S. 541, 566–67 (1966).

evidence was that the shootings at Robinson's home, provoking Victim's murder, were the product of a gang war in Robinson's neighborhood. The State intended to prove Robinson was a member of the Young Gunnas, a rival gang of Loud Pack, and that the gang war served as motive and intent for Victim's murder. The court denied Robinson's motion, stating the gang evidence was relevant, the State could prove his involvement in the gang by clear and convincing evidence, and the documented shootings between the gangs were admissible to prove motive, intent, or a common scheme. The court also found that although the introduction of the evidence created a genuine risk of unfair prejudice, it did not violate Rule 403, SCRE.

At trial, through sixteen of its thirty-two witnesses, the State elicited testimony regarding the supposed gang war. The State questioned witnesses about their affiliations with the two gangs, Robinson's affiliation with the Young Gunnas, two other murders that occurred in Robinson's neighborhood, and several other shootings in the neighborhood. At the outset of trial, the State questioned the four men who occupied the Chrysler 300 during the car chase. All four men testified they did not know the nine men chasing them, except for Robinson and Simmons, and that the posse had no reason to shoot at them. The men also testified they did not know what caused friction between the Young Gunnas and Loud Pack or if tension even existed. They also stated they were not members of Loud Pack and that they did not know if Robinson was a Young Gunna.

Simmons, Anderson, Green, and Leroy Manigault also testified about the gangs. Simmons testified that he knew of the gangs but was not a member of the Young Gunnas. He stated, however, that he was associated with the gang because his friends were members. When asked if Robinson was a member of the gang, Simmons first stated "I don't think so" but then admitted Robinson was a member after further questioning. He also stated he thought it was Loud Pack members that shot at him but that he did not think the men who occupied the Chrysler 300 were in that gang. Simmons further testified he was not sure what caused the friction between the two gangs but noted the "streets were saying" Robinson's cousin, who was the head of the Young Gunnas, killed a member of Loud Pack. Anderson stated he knew of the gangs and their conflicts but it was "street talk, nothing that [he] knew for sure." Like Simmons, Anderson did not know the men identified in the Chrysler 300 or why they would target his group. He also said he had heard Robinson was a Young Gunna but that the gang was not active in 2015.

Manigault, a participant in the car chase and the supplier of Robinson's weapon, testified he thought the men in the Chrysler 300 were in Loud Pack and that they

were the shooters. He talked about Loud Pack and how people said Robinson's cousin shot a member of the gang but that it was not true. He also discussed two other shootings that he participated in several days after Victim's death. Manigault believed the target of one of the subsequent shootings was involved in the shootings at Robinson's home. He also stated Robinson and his uncle were both Young Gunnas. On cross-examination, Manigault admitted he had no firsthand knowledge concerning the two gangs and their tumultuous relations and that he was not a member of the Young Gunnas. Green, on the other hand, admitted he was a member of the Young Gunnas and stated that Robinson was a member too. He testified the occupants of the Chrysler 300 were members of a gang but not Loud Pack and that those two gangs were not associated. He did not think Loud Pack was responsible for the drive-by shootings at Robinson's home. Green also discussed the strain between the two gangs, claiming "the streets" said members from both sides were killing each other and that Robinson's cousin—again, according to the streets—killed a rival gang member. He admitted he had no firsthand knowledge and that it was all based on rumor.

The State also elicited testimony regarding Robinson wearing an ankle monitor at the time of the shooting and the charges that were pending against him that forced him to wear the monitor. The GPS within Robinson's ankle monitor placed him at the crime scene on the night of the murder. This fact was undisputed at trial. The State also proved Simmons's presence at the crime scene through cell phone data. The State then introduced evidence through several witnesses regarding spent shell casings found around Robinson's neighborhood during investigations of other shootings. The inference from the shells was that all of the shootings were connected and proved a gang war that Robinson was involved in through his uncle.

Detective Jerome Desheers, who the court refused to qualify as an expert, testified he was a member of an FBI taskforce called Safe Streets. His duties included identifying gangs, their activities, and their members. Desheers testified about the killings that had taken place in Robinson's neighborhood and identified the members of each gang who were suspected to be the killers. Based on his knowledge surrounding the shootings and the individuals involved, Desheers opined "there is an ongoing battle between" the Young Gunnas and Loud Pack with both sides "shooting back and forth." On cross-examination, Desheers admitted no member of either gang had been charged with the murders he suspected caused the gang war. He also admitted he had not interviewed any participants in the gang war regarding Victim's death.

Prior to the jury charge, Robinson requested the trial court instruct the jury on voluntary manslaughter as a lesser-included offense of murder. The trial court refused, stating no evidence suggested Simmons acted out of a heat of passion. The jury found Robinson guilty as indicted, and after holding an individualized sentencing hearing pursuant to *Aiken v. Byars*,[4] the trial court sentenced Robinson to concurrent terms of fifty years' imprisonment for murder and ten years' imprisonment for each count of attempted murder. This appeal followed.

## STANDARD OF REVIEW

Appellate courts sit to review only errors of law in criminal cases and are limited to determining whether the trial court abused its discretion. *State v. Miller*, 433 S.C. 613, 625, 861 S.E.2d 373, 379 (Ct. App. 2021). An abuse of discretion occurs when the trial court's ruling is based on an error of law or when there is no evidentiary support for its factual conclusions. *Id.* Review of a trial court's factual findings is prohibited unless they are clearly erroneous. *State v. Rios*, 388 S.C. 335, 337, 696 S.E.2d 608, 610 (Ct. App. 2010).

## ISSUES ON APPEAL

 I.   Did the trial court err in refusing to transfer jurisdiction to the family court for reassessment of Robinson's initial waiver determination?

 II.  Did the trial court err in admitting evidence of Robinson's gang affiliation to prove motive or intent in Victim's murder?

 III. Did the trial court err in failing to instruct the jury on voluntary manslaughter as a lesser-included offense of murder?

 IV.  Did the trial court err in failing to instruct the jury to consider Robinson's age during its charge on the hand of one, hand of all doctrine?

 V.   Did the trial court violate Robinson's constitutional rights in sentencing him to fifty years' imprisonment and in failing to grant him a new sentencing hearing?

## LAW/ANALYSIS

---

[4] 410 S.C. 534, 765 S.E.2d 572 (2014).

## I.      Remand to Family Court

Robinson argues the trial court erred in refusing to remand his case back to the family court.  Robinson asserts the family court's use of Simmons's original statement claiming Robinson was the shooter in its transfer order was "a fundamental misapprehension of the facts of the case" and that Simmons's admission of guilt was sufficient to warrant another waiver hearing by the family court.  He asserts South Carolina should allow juveniles a remedy when newly discovered evidence arises after the original transfer hearing.[5]  We disagree and affirm on this issue.

Waiver of jurisdiction over a juvenile by the family court is reviewed under an abuse of discretion standard.  *See State v. Pittman*, 373 S.C. 527, 559, 647 S.E.2d 144, 161 (2007).  Family courts have exclusive original jurisdiction over any action concerning a child living within the geographical limits of its jurisdiction who allegedly violated a state law.  S.C. Code Ann. § 63-3-510(A)(1)(d) (Supp. 2022).  Family courts may transfer cases involving a fifteen-year-old child to a trial court if the child is charged with an offense that, if committed by an adult, would be a Class A, B, C, or D felony or a felony that provides for a maximum term of imprisonment of fifteen years or more.  S.C. Code Ann. § 63-19-1210(5) (Supp. 2022).  Upon a motion to transfer jurisdiction, the family court must determine, after conducting a full investigation and hearing, if it is in the best interest of the child and the public to grant a transfer request.  § 63-19-1210 (5); *State v. Kelsey*, 331 S.C. 50, 64, 502 S.E.2d 63, 70 (1998).

Under *Kent*, to transfer jurisdiction, a family court must consider eight factors and make sufficient findings demonstrating careful consideration of the factors.[6]  383

---

[5] Robinson proposes a standard similar to the one Wisconsin utilizes.  For a trial court to reconsider a family court's transfer order in Wisconsin, a juvenile must present new, compelling grounds, not considered at the waiver hearing, that (1) were not in existence at the time of the waiver hearing or was unknowingly overlooked, (2) are highly relevant to the criteria for waiver, and (3) are likely to have affected the family court's transfer determination.  *In re Vairin M.*, 647 N.W.2d 208, 219 (Wis. 2002).

[6] The factors include (1) the seriousness of the offense; (2) whether the offense was committed in an aggressive, premeditated, violent, or willful manner; (3) whether the alleged offense was perpetrated against persons or property, greater weight being given to offenses against a person, especially if injury resulted; (4) the merit of the complaint; (5) judicial economy; (6) the juvenile's sophistication and

U.S. at 566–68. The serious nature of the offense is a major factor in the family court's decision. *Sanders v. State*, 281 S.C. 53, 56, 314 S.E.2d 319, 321 (1984).

In the present case, the family court did an excellent job summarizing the facts and outlining its reasons for waiving jurisdiction in a fourteen-page transfer order. The family court weighed all the *Kent* factors and found that transfer was proper because (1) murder and attempted murder are the most serious criminal offenses; (2) the offenses were committed against an innocent civilian and culminated in her death; (3) the offenses were committed in an aggressive, violent, premeditated, and willful manner; (4) ample evidence existed to allow a grand jury to return indictments on all charges; (5) Robinson had an extensive, violent criminal history[7]; and (6) the abysmal failure of the South Carolina Department of Juvenile Justice (DJJ) in monitoring Robinson while he was under house arrest created a concern for adequate public protection (records show Robinson left his home 260 times without detection, despite DJJ receiving daily tracking reports).

The family court also considered the conclusions and recommendations of the two doctors that performed Robinson's prewaiver evaluations. Despite acknowledging that Robinson appeared amenable to DJJ services and that he "flourished" in a secure and structured environment, the family court determined the structure of South Carolina's juvenile commitment laws did not adequately protect the public

---

maturity as defined by his home life, environmental situation, emotional attitude, and pattern of living; (7) the juvenile's criminal history, including probation; and (8) the prospects for adequate public protection and the likelihood of reasonable rehabilitation if the juvenile is found guilty of the alleged offense. 383 U.S. at 566–67.

[7] In the court's factual recitation, it listed Robinson's extensive criminal history. At twelve years old, Robinson was charged with disorderly conduct. At fourteen years old, after police conducted a drug raid on his grandmother's home, he was charged with trafficking cocaine (an officer testified Robinson was laughing as he claimed ownership of the cocaine); possession of cocaine with intent to distribute (PWID) within proximity of a school; PWID marijuana; PWID marijuana within proximity of a school; possession of a firearm with an obliterated serial number; possession of a stolen firearm; and possession of a handgun by a minor. While awaiting adjudication of these charges, Robinson was charged with attempted murder (amended to assault and battery of a high and aggravated nature), possession of a firearm during the commission of a violent crime, attempted armed robbery, and unlawful carrying of a handgun by a minor. Robinson cut off his electric GPS ankle monitor on the way to commit the robbery.

from Robinson. The court reasoned that the statutory scheme did not guarantee Robinson would remain in DJJ until his twenty-first birthday, divested the family court of authority to ensure Robinson stayed in DJJ until his twenty-first birthday, and mandated his release upon his twenty-first birthday unconditionally without any supervision.

We find the trial court did not abuse its discretion in failing to transfer Robinson's case back to family court. First, the family court accorded appropriate weight to the conflicting statements from Robinson and Simmons, concluding that under the circumstances, the judicial economy of trying Robinson and his codefendants in one court was desirable. The family court's reasoning is appropriate, even considering Simmons's confession, because there was no dispute that Robinson was in the car when Simmons fired the lethal bullets or that Robinson shot the murder weapon from the moving vehicle before handing it to Simmons to shoot at Victim's car.

Second, although Robinson argues otherwise, Simmons's confession does not diminish the seriousness of the offenses for which Robinson was charged or his culpability in those crimes. Both murder and attempted murder are serious offenses, regardless of the means the State uses to prosecute the charges. Robinson admitted at the pretrial motions hearing that despite Simmons's admission, the family court's review under the other *Kent* factors would not change and that Simmons's admission did not change the State's theory of the case, i.e., the hand of one is the hand of all. Under this theory, murder and attempted murder carry the same weight as if Robinson had pulled the trigger himself.

Finally, even if the trial court remanded jurisdiction to the family court to reevaluate its transfer determination, the limited, new evidence would not affect the family court's decision.[8] Much of the court's findings dealt with the aggressive and violent nature in which Victim's murder was perpetrated; Robinson's extensive and violent criminal history; and his lack of compliance with previous home

---

[8] Thus, even if this court were to conclude the trial court abused its discretion and should have remanded the case to family court, Robinson would fail under his own proposed standard. *See In re Vairin M.*, 647 N.W.2d 208, 219 (Wis. 2002) ("As grounds for the [motion to remand jurisdiction], the juvenile must allege a new factor that . . . likely would have affected the [family] court's determination that it would be contrary to the best interests of the juvenile or of the public for the [family] court to hear the case.").

detention orders, which resulted "in him committing more egregious criminal offenses." Because the new evidence did not diminish the seriousness of the offense, it did not lower Robinson's culpability in the murder, and it would not have changed the outcome of the family court's transfer determination, we find the trial court had reasonable factual support to deny Robinson's motion to transfer jurisdiction. *See State v. Cory D.*, 339 S.C. 107, 118, 529 S.E.2d 20, 26 (2000). ("The term 'abuse of discretion' has no opprobrious implication and may be found if the conclusions reached by the [trial] court are without reasonable factual support."). Therefore, we affirm on this issue.

## II.     Gang-related Evidence

Pursuant to Rule 404(b), SCRE, Robinson argues the trial court erred in admitting evidence related to his gang affiliation. We agree and reverse on this issue.

Typically, evidence of a person's character is not admissible to prove the person acted "in conformity therewith on a particular occasion." Rule 404(a), SCRE. Under Rule 404(b), evidence of a person's "other crimes, wrongs, or acts" are inadmissible to prove a person's general character "in order to show action in conformity therewith." However, prior bad acts may be admissible to show motive or intent. Rule 404(b). The proponent of prior bad act evidence must demonstrate it has a legitimate purpose, "i.e., the evidence does something more than prove a person has propensity to commit crimes." *Johnson v. State*, 433 S.C. 550, 555, 860 S.E.2d 696, 699 (Ct. App. 2021).

> In a criminal case, the State must convince the trial court that the prior bad act evidence is logically relevant to a material fact at issue in the case: "If it is logically pertinent in that it reasonably tends to prove a material fact in issue, it is not to be rejected merely because it incidentally proves the defendant guilty of another crime."

*Id.* (quoting *State v. Lyle*, 125 S.C. 406, 417, 118 S.E. 803, 807 (1923)). Trial courts are to apply the logical relevancy test with "rigid scrutiny." *Id.* at 556, 803 S.E.2d at 699. If the court concludes the prior bad act evidence serves a purpose other than to show the defendant's proclivity for criminal conduct and the purpose is one listed under Rule 404(b), then such evidence is admissible unless its "probative value is substantially outweighed by the danger of unfair prejudice." Rule 403, SCRE; *see Johnson*, 433 S.C. at 556, 803 S.E.2d at 699. If the prior bad

act did not result in a prior conviction the state must prove the prior bad act by clear and convincing evidence. *Johnson*, 433 S.C. at 556, 803 S.E.2d at 699.

*Johnson* is instructive in this case as it is the only case in South Carolina to address whether gang-related evidence is admissible under Rule 404(b) to prove motive and intent. In that case, the defendant, a leader of a gang, ordered a hit on an individual after the defendant's gang and a rival gang were in a gunfight. *Id.* Before his trial, the defendant objected to the presentation of any gang-related evidence on the grounds it constituted inadmissible evidence of other crimes or bad acts and was unduly prejudicial. *Id.* at 553–54, 860 S.E.2d at 699. The trial court overruled the objection, stating the evidence was relevant and did not violate Rule 403. *Id.* At trial, a detective and a SLED agent were qualified as experts and testified to the defendant's gang's structure, rituals, characteristics, and the defendant's role as a leader in the gang. *Id.* at 555, 860 S.E.2d at 699. A former member of the gang testified as well and explained the defendant's power over the gang, including promotions, demotions, and discipline. *Id.* Two other gang members charged for the same shooting testified about their gang's rules, the defendant's firm leadership, the confrontation with the rival gang on the date of the shooting, and the defendant's order to his subordinates to execute the hit that resulted in the victim's murder. *Id.*

The court found the evidence constituted prior bad act evidence and that proof of a defendant's gang affiliation, without more, "generally proves nothing of consequence at a criminal trial and may even implicate First Amendment rights." *Id.* at 556–57, 860 S.E.2d at 700. However, the evidence presented against the defendant was probative—if not essential—to explain the motive and intent behind the otherwise senseless shooting of an innocent victim.[9] *Id.* at 557, 860 S.E.2d at 700.

We find the trial court erred in admitting evidence related to Robinson's gang affiliation. Without doubt, the testimony regarding Robinson's gang affiliation constituted prior bad act evidence. The question this court must answer is whether or not such evidence was logically relevant to Robinson's involvement in the

---

[9] The *Johnson* court cautioned the bar, however, stating "cases where prior bad act evidence of gang affiliation may be admitted to prove 'motive' or 'intent' will be uncommon, and these terms 'are not magic passwords whose mere incantation will open wide the courtroom doors to whatever evidence may be offered in their names.'" *Id.* at 558, 860 S.E.2d 700–01 (quoting *United State v. Goodwin*, 492 F.2d 1141, 1155 (5th Cir. 1974)).

crimes for which he was charged *and* proved motive or intent to commit such a crime. *See id.* at 556, 860 S.E.2d at 699 ("In a criminal case, the State must convince the trial court that the prior bad act evidence is logically relevant to a material fact at issue in the case."); *State v. Perry*, 430 S.C. 24, 31, 842 S.E.2d 654, 657 (2020) ("The question of a trial court, [appellate courts reviewing a defendant's conviction], is whether the evidence also serves some legitimate purpose that is not prohibited by Rule 404(b)."). We find the gang-related evidence was not logically relevant to any material fact at issue. The witnesses that testified to participating in the car chase admitted the two prior shootings in front of Robinson's home provoked their actions. Simmons testified that he was upset someone had vandalized his car and wanted retaliation for being shot at twice. He ultimately admitted on the stand to shooting Victim.

Drawing comparisons to *Johnson*, in which motive and intent were critical in connecting the defendant to the crime, here, such evidence was unnecessary to show why Simmons shot at Victim. In *Johnson*, the gang evidence was essential to explain the motive and intent behind the otherwise senseless shooting of the innocent victim and was logically relevant to prove the charges against the defendant—criminal conspiracy and accessory to murder after the fact. In this case, the State proffered testimony from sixteen witnesses regarding gang evidence; only one definitively stated he and Robinson were members of Young Gunnas. Others ultimately stated Robinson was "associated" with the gang or that they "heard" he was in the gang, but no one else that made these speculative statements admitted to being in the gang, testified to knowing the Chrysler was in fact occupied by members of Loud Pack, or testified to personal knowledge of the conflict between the gangs. Unlike the circumstances in *Johnson*, in which it was undisputed the killing occurred after an altercation between rival gangs and the defendant was not present at the crime scene but ordered the hit, here, it was unrefuted that Robinson was in the car when Simmons shot Victim and fired his own weapon from the car after two shootings at his home.

Further, we find the State failed to clear the hurdle provided by Rule 403, making such evidence inadmissible regardless of the Rule 404(b) analysis. "In criminal cases, the term 'unfair prejudice' 'speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.'" *Johnson*, 433 S.C. at 558–59, 860 S.E.2d at 701 (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997)). "Evidence of gang affiliation demands careful handling because of its power to distract the fact finder from its rational task of deciding the facts from objective

evidence, luring their attention to the lurid, raising the risk that they will decide the case on an improper or subjective . . . basis." *Id.*

In this case, the State presented much evidence that was substantially prejudicial to Robinson's case and confusing to the jury. For instance, the State continued to question witnesses about two murders and various shootings that occurred in Robinson's neighborhood in an attempt to prove an ongoing gang war in the neighborhood. The State presented testimony from detectives and SLED agents that investigated the prior crimes; introduced photographs from those crimes; and proffered forensics of shell casings found at those crime scenes. However, none of the evidence clearly connected Robinson or Simmons to the prior shootings *or* to the two shootings that provoked the extended car chase resulting in Victim's murder. The risk of unfair prejudice and confusion raised by the evidence related to a gang war and Robinson being a member of the Young Gunnas substantially outweighed the scant probative value such evidence brought to the table.

While the State argues any error in admitting the gang-related evidence was harmless, we find it hard to reconcile this contention with the fact the State questioned half of its witnesses about gang-related evidence and repeatedly spoke to gang characteristics and gang violence in its opening and closing arguments. The State, through eliciting such a large quantity of gang-related evidence, essentially put Robinson on trial for being a member of a gang and the gang activity in his neighborhood. This type of prior bad act evidence is precisely what Rules 403 and 404(b), seek to exclude from trials. *See Johnson*, 433 S.C. at 559, 860 S.E.2d at 701 ("The rules of evidence recognize verdicts are still rendered by human hands, not the artificial workings of algorithms, and emotion has its place. Rule 403 ensures emotion stays in its place."); *id.* at 556–57, 433 S.E.2d at 700 ("Rule 404(b) bars the use of prior bad act evidence to prove character, deeming it useless to the factfinder, for such use does not make any legitimate fact at issue more or less probable. Proof that a defendant was a member of a gang, without more, generally proves nothing of consequence at a criminal trial and may even implicate First Amendment rights."). The purpose of the rules of evidence is to facilitate fair proceedings that bring forth the truth, not the whole truth, from its shroud of smoke and mirrors in a manner that will secure fair and just outcomes at trial. *See* Rule 102, SCRE. Because the gang-related evidence presented at Robinson's trial was not slight, was not logically relevant to prove any motive or intent behind Victim's murder, and the dangers of unfair prejudice and confusion it produced substantially outweighed any probative value, we find the trial court

erred in denying Robinson's motion to suppress such evidence.  Therefore, we reverse on this issue.[10]

**CONCLUSION**

Accordingly, we affirm in part, reverse in part, and remand for a new trial.

**VINSON, J., and LOCKEMY, A.J., concur.**

---

[10] Because our holding on this issue is dispositive of the appeal, we need not address the remaining issues.  *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (providing appellate courts are not required to address remaining issues after the resolution of a dispositive one).